*Public version – confidential material redacted*

# United States Court of Appeals
# for the Federal Circuit

2013-1353
(Opposition No. 91191681)

## STONE LION CAPITAL PARTNERS, L.P.,

*Appellant,*

v.

## LION CAPITAL LLP,

*Appellee.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board.

## PRINCIPAL BRIEF FOR APPELLANT

Karol A. Kepchar
Patricia A. Millett
Ruthanne M. Deutsch
Emily C. Johnson
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564
Phone: (202) 887-4000
Fax: (202) 887-4288

*Counsel for Appellant Stone Lion
Capital Partners L.P.*

**Form 9**

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Stone Lion Capital Partners _____ v. Lion Capital LLP _____

No. 13-1353

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Petitioner Stone Lion Capital Partners, L.P. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.       The full name of every party or amicus represented by me is:

Stone Lion Capital Partners, L.P.

_____

2.       The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Stone Lion Capital Partners, L.P.

_____

3.       All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.   ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Karol A. Kepchar, Patricia A. Millett, Ruthanne M. Deutsch, David C. Lee, Laura T. Geyer, and Emily C. Johnson, of Akin Gump Strauss Hauer & Feld LLP, Robert S. Strauss Building, 1333 New Hampshire Avenue, N.W., Washington, DC, 20036.

_____

_____5/8/13_____          _____/s/ Emily C. Johnson_____
Date                                              Signature of counsel

                                              _____Emily C. Johnson_____
                                              Printed name of counsel

Please Note: All questions must be answered
cc: Counsel of Record _____

124

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................ I

STATEMENT OF RELATED CASES .............................................. 1

JURISDICTIONAL STATEMENT .................................................. 2

STATEMENT OF THE ISSUES ON APPEAL .................................. 3

STATEMENT OF THE CASE .......................................................... 4

STATEMENT OF THE FACTS ........................................................ 5

      A.    FACTUAL BACKGROUND. ......................................... 5

      B.    PROCEDURAL HISTORY .......................................... 14

SUMMARY OF THE ARGUMENT .............................................. 16

ARGUMENT ............................................................................... 19

   I.    STANDARD OF REVIEW. ............................................ 19

   II.   THERE IS NO LIKELIHOOD OF CONFUSION BETWEEN THE MARKS. ..................................................... 20

      A.    LEGAL  STANDARD. ................................................ 20

      B.    THE BOARD COMMITTED LEGAL ERROR IN DISMISSING PURCHASER SOPHISTICATION AND CONDITIONS OF SALE. ..................................... 22

          1.    *The Board Gave No Legal Effect to the Extensive Evidence of Sophistication.* ........................................ 23

          2.    *The Board Hypothesized a Second Class of Unsophisticated "Ordinary" Investors without Substantial Evidence.* ................................................. 29

          3.    *The Board's Comparison of the Marks Was Predicated on Legal Error.* ........................................ 31

B.   THE BOARD CONDUCTED AN ERRONEOUS
     COMPARISON OF THE MARKS. ......................................32

     1.   *Incorporation of a Portion of Another's Mark
          Does Not Ipso Facto Constitute Confusing
          Similarity.*....................................................................... 32

     2.   *The Board Erred in Dismissing "STONE" as
          Merely an Adjective and Finding "LION" to be the
          Dominant Portion of STONE LION CAPITAL.*........... 35

     3.   *Properly Analyzed, The Marks Are Readily
          Distinguishable and Non-Confusing in Context.*......... 37

     4.   *The Board Afforded Excessive Weight to the
          Similarity of the Marks.* ............................................... 39

C.   THE BOARD ERRED IN ANALYZING THE
     PURCHASERS AND TRADE CHANNELS. .......................42

     1.   *Likelihood of Confusion Must Exist in a
          Purchaser, Not Generally in an Institution.* ................ 42

     2.   *The Board's Conclusion that the Purchasers Are
          the Same Is Not Supported By Substantial
          Evidence.* ...................................................................... 44

CONCLUSION ......................................................................................45

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
     LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE
     REQUIREMENTS ......................................................................47

CERTIFICATE OF SERVICE ..........................................................48

ADDENDUM ........................................................................................49

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from this brief includes confidential information that
was placed under seal by the Board.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alta Vista Corp., Ltd. v. Digital Equip. Corp.*,
   44 F. Supp. 2d 72 (D. Mass. 1998) ....................................................28

*Amalgamated Bank of New York v. Amalgamated Trust & Savings Bank*,
   842 F.2d 1270 (Fed. Cir. 1988) .........................................................27

*American Steel Foundries v. Robertson*,
   269 U.S. 372 (1926)...........................................................................36

*Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*,
   718 F.2d 1201 (1st Cir. 1983)......................................................*passim*

*Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*,
   811 F.2d 1479 (Fed. Cir. 1987) ...................................................21, 27

*Bose Corp. v. QSC Audio Prods., Inc.*,
   293 F.3d 1367 (Fed. Cir. 2002) .........................................................20

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ...........................................................28

*Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas, Inc.*,
   77 U.S.P.Q.2d 1492 (T.T.A.B. 2005) .................................................21

*China Healthways Inst., Inc. v. Xiaoming Wang*,
   491 F.3d 1337 (Fed. Cir. 2007) ....................................................32, 37

*Colgate-Palmolive Co. v. Carter-Wallace, Inc.*,
   432 F.2d 1400 (C.C.P.A. 1970) .........................................................35

*Dynamics Research Corp. v. Langenau Mfg. Co.*,
   704 F.2d 1575 (Fed. Cir. 1983).........................................................24

*Edwards Lifesciences Corp. v. VigiLanz Corp.*,
   94 U.S.P.Q.2d 1399 (T.T.A.B. 2010)......................................21, 43, 45

*Electronic Design & Sales, Inc. v. Electronic Data Sys. Corp.*,
   954 F.2d 713 (Fed. Cir. 1992) ....................................................*passim*

iii

*Franklin Mint Corp. v. Master Mfg. Co.*,
   667 F.2d 1005 (C.C.P.A. 1981) ..........................................................................33

*Han Beauty, Inc. v. Alberto-Culver Co.*,
   236 F.3d 1333 (Fed. Cir. 2001) ........................................................................19

*Hasbro, Inc. v. Clue Computing, Inc.*,
   66 F. Supp. 2d 117 (D. Mass. 1999), *aff'd*, 232 F.3d 1 (1st Cir. 2000) .............28

*Highfields Capital Mgmt., L.P. v. Doe*,
   385 F. Supp. 2d 969 (N.D. Cal. 2005) ..............................................................26

*In re Digirad Corp.*,
   45 U.S.P.Q.2d 1841 (T.T.A.B. 1998) ........................................................25, 43

*In re Dixie Rests., Inc.*,
   105 F.3d 1405 (Fed. Cir. 1997) ........................................................................21

*In re E.I. DuPont DeNemours & Co.*,
   476 F.2d 1357 (C.C.P.A. 1973) ...............................................................*passim*

*In re Nat'l Data Corp.*,
   753 F.2d 1056 (Fed. Cir. 1985) ................................................................. 33, 37

*In re Pacer Tech.*,
   338 F.3d 1348 (Fed. Cir. 2003) ........................................................................19

*In re Research and Trading Corp.*,
   793 F.2d 1276 (Fed. Cir. 1986) ........................................................................31

*Kellogg Co. v. Pack'em Enters., Inc.*,
   951 F.2d 330 (Fed. Cir. 1991) ........................................................................21

*Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*,
   963 F.2d 350 (Fed. Cir. 1992) ....................................................................36, 39

*Lang v. Retirement Living Publ'g Co., Inc.*,
   949 F.2d 576 (2d Cir. 1991) ............................................................................28

*M2 Software, Inc. v. M2 Commc'ns, Inc.*,
   450 F.3d 1378 (Fed. Cir. 2006) ........................................................................19

*Murray Corp. v. Red Spot Paint & Varnish Co., Inc.*,
    280 F.2d 158 (C.C.P.A. 1960) ............................................................34

*Nautilus Grp., Inc. v. ICON Health and Fitness, Inc.*,
    372 F.3d 1330 (Fed. Cir. 2004) ..........................................................35

*On-Line Careline, Inc. v. America Online, Inc.*,
    229 F.3d 1080 (Fed. Cir. 2000) ...................................................19, 30

*Presto Prods., Inc. v. Nice-Pak Prods., Inc.*,
    9 U.S.P.Q.2d 1895 (T.T.A.B. 1988) ..................................................37

*Recot, Inc. v. M.C. Becton*,
    214 F.3d 1322 (Fed. Cir. 2000) ..........................................................39

*Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*,
    748 F.2d 669 (Fed. Cir. 1984) ............................................................40

*Sure-Fit Prods. Co. v. Saltzson Drapery Co.*,
    254 F.2d 158 (C.C.P.A. 1958) ............................................................36

*Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.*,
    135 U.S.P.Q. 45 (2d Cir. 1962) ..........................................................36

*Union Carbide Corp. v. Ever Ready Inc.*,
    188 U.S.P.Q. 623 (7th Cir. 1976), *cert. denied*, 429 U.S. 830 (1976) ..............36

*Weiss Assocs., Inc. v. HRL Assocs., Inc.*,
    902 F.2d 1546 (Fed. Cir. 1990) ...................................................28, 29

**STATUTES**

15 U.S.C. § 1052(d) .........................................................*passim*

15 U.S.C. § 1067 ...............................................................................2

15 U.S.C. § 1071(a)(1) ......................................................................2

28 U.S.C. § 1295(a)(4)(B) ................................................................2

**OTHER AUTHORITIES**

17 C.F.R. § 230.502(c) ......................................................................6, 26

17 C.F.R. § 230.506(c) .............................................................................7

Federal Register, *Eliminating the Prohibition Against General Soliciation and General Advertising in Rule 506 and Rule 144A Offerings,* 78 Fed. Reg. 44771 (July 24, 2013) ......................................................7

Jumpstart Our Business Startups Act, Pub. L. No. 10, 112th Congress, 2d Sess. (2012) .................................7

Woodtrails-Seattle, Ltd., SEC No-Action Letter, [1982-1983 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,342 (July 8, 1982) .................................7

*Trademark Manual of Examining Procedure*, § 1213 (April 2013) ........................34

## STATEMENT OF RELATED CASES

Appellant is aware of no other appeals that have been filed from the underlying decision of the Trademark Trial and Appeal Board ("Board") of the U.S. Patent and Trademark Office ("USPTO") in Opposition No. 91191681.

# JURISDICTIONAL STATEMENT

The Board had jurisdiction over the opposition proceeding under 15 U.S.C. § 1067. In Opposition No. 91191681, Appellant Stone Lion Capital Partners L.P. ("Stone Lion") claimed it was damaged by registration of the opposed STONE LION CAPITAL mark on the basis of likelihood of confusion with Appellee Lion Capital LLP's ("Lion Capital") LION and LION CAPITAL marks pursuant to Lanham Act Section 2(d), 15 U.S.C. § 1052(d).

This Court has jurisdiction under Lanham Act Section 21(a)(1), 15 U.S.C. § 1071(a)(1), and 28 U.S.C. § 1295(a)(4)(B). The Board's final decision and order was issued on January 18, 2013 sustaining Opposition No. 91191681 and thus denying registration to Appellant's Application Serial No. 77/551,196 for STONE LION CAPITAL in the U.S. Patent and Trademark Office ("USPTO"). Appellant timely filed this appeal on March 15, 2013. This appeal is from a final order disposing of all claims with respect to all parties. 28 U.S.C. § 1295(a)(4)(B).

## STATEMENT OF THE ISSUES ON APPEAL

This is an appeal of a decision from the Board in a trademark opposition proceeding.  The issues presented on appeal are:

I.      Whether, in deciding that there was a likelihood of confusion between the parties' marks, the Board erred as a matter of law in failing to give proper weight to (i) legal requirements and record evidence establishing purchaser sophistication and the highly regulated conditions of sale, and (ii) Appellee's concession that there was no likely confusion between the marks at the point of sale.

II.     Whether the Board committed legal error by dissecting the STONE LION CAPITAL mark and discounting the contribution made by the adjectival term STONE to the overall commercial impression created by STONE LION CAPITAL.

III.    Whether the Board erred as a matter of law by failing to identify and consider the differences in relevant purchasers for the parties' services within purchasing institutions, and in concluding that the parties' purchasers are the same without the support of substantial evidence.

## STATEMENT OF THE CASE

This case arises from a trademark opposition proceeding before the Board.

On August 20, 2008, Appellant Stone Lion sought to register with U.S. Patent and Trademark Office ("USPTO") the mark STONE LION CAPITAL for use in connection with "financial services, namely investment advisory services, management of investment funds, and fund investment services." A1.

On August 27, 2009, Appellee Lion Capital opposed the registration for STONE LION CAPITAL on the ground of likelihood of confusion with its marks LION and LION CAPITAL under the Lanham Act. *See* 15 U.S.C. § 1052(d).

On January 18, 2013, the Board ruled that there is a likelihood of confusion between the marks. A20.

Stone Lion timely appealed the Board's decision to this Court.

4

## STATEMENT OF THE FACTS

**A.    Factual Background.**

*1.    The Parties.*

Appellant Stone Lion is a New York-based investment management company that offers its investment funds to qualified investors who are interested in putting money into credit opportunities. A4375, A4380. Stone Lion launched its first fund and began using the STONE LION CAPITAL mark in 2008. A4788, A4375, A4474. Alan Mintz and Greg Hanley, well-known and trusted experts in credit and distressed investing, founded and continue to manage the Stone Lion funds. A4375-76, A335-36.



Appellee Lion Capital is a United Kingdom-based private equity firm ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ that take a controlling stake in mid-sized and large consumer-oriented businesses located primarily in Europe. A6, ▆▆▆▆▆ Lion Capital's activities in the United States have been limited

thus far to a controlling interest in just four U.S. companies, and for two of those companies Lion Capital divested its stake in 2010.  A4216, A4219, A4223, A4228.

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████  By 2008, two of those three Lion Capital funds were closed to new investors.  A4169-70.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████    ██████████████████████████████████████

████████████████████████████████████

## 2.     *The Governing Business Regulatory Framework.*

Both Stone Lion and Lion Capital are subject to U.S. securities laws in providing their investment services in the United States.  Neither company can advertise its investments or solicit the general public to invest.  17 C.F.R. § 230.502(c); A337.  Instead, solicitations are lawful only if there exists a documented substantive and pre-existing relationship with the potential investor that permits the offeror to determine that the potential investor has sufficient

knowledge and experience to evaluate the investment. Woodtrails-Seattle, Ltd., SEC No-Action Letter, [1982-1983 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,342, at 78,285 (July 8, 1982).[1]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████    ████████████████████

█████    ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[1] On April 5, 2012, the President signed the Jumpstart Our Business Startups Act ("JOBS Act"), which changed certain restrictions on unregistered public offerings. Pub. L. No. 10, 112th Congress, 2d Sess. (2012). The U.S. Securities and Exchange Commission recently issued JOBS Act-related regulations. *See* Federal Register, *Eliminating the Prohibition Against General Soliciation and General Advertising in Rule 506 and Rule 144A Offerings*, 78 Fed. Reg. 44771 (July 24, 2013), codified as 17 C.F.R. 230.506(c). By virtue of the new law and regulations, the way in which unregistered offerings are marketed may change in the future. Under the new regulations, an offeree must still confirm that they are dealing with a qualified investor in a process at least as intensive as under the current regulations. In any event, the decision under review was based on the pre-existing legal environment prohibiting advertising or solicitation for private investments.

███████████████████████████████████████████████

████████████████████    Based on these specialized conditions of sale, which are undisputed, Lion Capital conceded that it is "virtually inconceivable" that investors are likely to be confused by the marks at the point of sale. A303. The testimony of Lion Capital's witnesses supports this concession that there is no likelihood of point-of-sale confusion based on the diligence process and investor sophistication. *See, e.g.*, A4081, A3748-49.

### *3.    Stone Lion's Customer Relationship Environment.*

████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████    ██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████   ████████   ██████████

███████████████████████████████

█████████████████████████████

**4.     *Lion Capitol's Customer Relationship Environment.***

The process undertaken by Lion Capital to identify, qualify and engage investors is similarly rigorous and individualized.  *See* A10-11.  ████████

███████████████████████████████

███████████████████████████████

████████████   ████████   ██████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████

The record before the Board regarding this commercial and regulatory environment in which the parties operate is extensive, and describes the regulated conditions under which the parties' services are encountered and engaged by the intended consumers. These undisputed facts are so significant to this case that Lion Capital readily conceded that likelihood of confusion by investors at the point of sale is "virtually inconceivable." A303. ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

### 5.    *The Marks at Issue.*

Stone Lion selected STONE LION CAPITAL as a mark for its investment services because its business operates within sight of the iconic stone lion statues "Patience" and "Fortitude" flanking the doorway of the New York Public Library. A4378-79, A4503. ████████████████████████

████████████████████████████████████████████

███████████ The STONE LION CAPITAL mark was chosen for its connotations of patience, courage, fortitude and strength. A4379.

In 2008 and 2009, Lion Capital obtained United States trademark registrations for LION and LION CAPITAL for a wide range of investment and

financial services.[2]  The record establishes that the LION and LION CAPITAL marks are not well-known in the United States financial industry.  A14.

There is extensive evidence of third party use of similar marks in the financial services industry, including, *inter alia*, BLUE LION CAPITAL (A4251-52, A4254-55, A4261-62, A4265-66), LION CHEMICAL CAPITAL (A4835-84), LIONESS CAPITAL PARTNERS & DESIGN (A5370-71, A5428-36), and LION HOUND (A3715-16, A5370-71, A5437-42).  *See* A15.  There is also extensive third party usage of similar marks on the Internet, including Liongate Capital Management; LionEye Capital Management LLC, Lion's Path Capital, Lion

---

[2]  LION CAPITAL (Reg. No. 3,543,654): "Equity capital investment; venture capital services, namely providing financing to emerging and start-up companies; leveraged buy outs and investments in financially distressed or underperforming companies; real estate investment; hedge fund services."  A5037, *see also* A7-8.

LION (Reg. No. 3,654,484): "Financial services, namely, financial and investment planning and research, financial consultation, and assisting others with the completion of financial transactions for stocks, bonds, securities and equities; venture capital services, namely, providing financing to emerging and start-up companies; leveraged buy outs and investments in financially distressed or under performing companies; real estate affairs, namely, real estate investment services; equity capital investment; investment services, namely, investment management services, mutual fund and hedge fund investment services, management of a capital investment fund, capital investment consultation and financial trust operations; trust services, namely, investment and trust company services; advisory and consultancy services relating to corporate finance and venture capital services; investment in the field of private equity, venture capital and specialized funds and other funds; advising on and managing investments; private equity investment management; buying, selling and holding of securities; investment management services relating to acquisitions and mergers; management of equity and debt investment portfolios; investment asset management."  A261, *see also* A7-8.

12

Capital Group, Blue Lion Capital Management, LLC, LionStone Capital Management, Lion Capital Investment Group, Lion Capital LLC, Sea Lion Capital Management LLC, Lion Capital Holdings, Inc., Lion Capital Management Ltd., Lion Pride Capital Partners LLC, Lion Capital Partners, L.P., and Lion Share Capital LLC. A16, A5257-321.



In addition, during prosecution of the LION CAPITAL application, Lion Capital described ROARING LION registered to a third party for venture capital services as significantly different from LION CAPITAL in "all aspects of the sight-sound-meaning trilogy":

> The composite mark "ROARING LION" conjures up a specific action and sound and is distinct from LION alone or other LION-formative marks.
>
> ****
>
> The notions suggested by ROARING are not passive or meek. The presence of a strong first term like ROARING therefore contributes significantly to the overall impression of the cited mark, and the weight of this portion cannot be overlooked or

discounted.

A5054-59, A3744-45.

## B.    Procedural History.

On August 20, 2008, at about the time it launched its business, Stone Lion filed a U.S. trademark application for STONE LION CAPITAL. A1, A4366. The application covers "financial services, namely investment advisory services, management of investment funds, and fund investment services." A1.

Lion Capital opposed the registration on the ground of likelihood of confusion with its marks LION and LION CAPITAL under the Lanham Act. *See* 15 U.S.C. § 1052(d).  Specifically, Lion Capital contended that the relevant consumers would likely be confused by STONE LION CAPITAL (rights to CAPITAL disclaimed) based on the marks LION CAPITAL (rights to CAPITAL disclaimed) and LION registered in 2008 and 2009, respectively, for various corporate finance, investment, real estate and trust company services.

The Board examined the case on a full record relating to the likelihood of confusion factors, enumerated in *In re E.I. DuPont DeNemours & Co*., 476 F.2d 1357, 1361 (C.C.P.A. 1973).  The parties agreed that the relevant *DuPont* factors in this case are:  (1) the distinctions between the marks in the context of the services; (2) the differences between the services as identified in the application and registrations involved; (3) the trade channels limited to direct person-to-person

14

contact with clients and potential clients already having a substantial pre-existing relationship; (4) the highly sophisticated investors and the directly personal and time consuming conditions of sale; (5) the weakness of Lion Capital's marks; (6) third party use of similar marks, including BLUE LION CAPITAL and LION CHEMICAL CAPITAL, and Lion  Capital's admissions during prosecution of its registrations as to the commercial impression made by its marks and other LION marks in the investment field.

On the merits, the Board found that four *DuPont* factors (*i.e.*, similarity of the marks, similarity of the services, established and likely to continue trade channels, and purchaser sophistication and conditions of sale) weighed in favor of likelihood of confusion, but that the remaining factors (*i.e.*, weakness of Lion Capital's marks, third party use of similar marks, and Lion Capital's admissions during prosecution of its marks) were neutral to the analysis.

The Board dismissed the evidence of the highly regulated conditions of investment and extreme sophistication of the qualified purchasers based on the unrestricted description of services in the application and registrations involved. A19.  Moreover, the Board dissected the word STONE from LION, and dismissed its importance as a mere "adjective" to the word LION.  A13-14.  Although the Board recognized that CAPITAL should be afforded little consideration because both parties disclaimed exclusive rights in the term, it nonetheless accorded it

weight by claiming that the STONE LION CAPITAL mark "incorporates the *entirety* of [LION CAPITAL's] marks." A13 (emphasis added). The Board also found that Lion Capital failed to establish that its LION and LION CAPITAL marks are well-known and entitled to broad protection. And despite Lion Capital's concession that investor confusion is "virtually inconceivable," A303, the Board concluded that confusion between the STONE LION CAPITAL and LION and LION CAPITAL marks was likely.

Stone Lion timely appealed the Board's decision to this Court.

## SUMMARY OF THE ARGUMENT

There is no likelihood of confusion between the STONE LION CAPITAL mark and Lion Capital's LION and LION CAPITAL trademarks, when the relevant *DuPont* factors are properly weighed and considered in light of the law and record evidence. The Board's opinion rested critically on legal errors that infected its entire *DuPont* analysis and require a *de novo* rebalancing of the relevant factors based on established precedent and all record evidence.

First and foremost, the Board ignored that both as a matter of legal requirements and undisputed record evidence, the relevant clientele and marketplace realities render customer confusion virtually impossible. Indeed, for the different types of financial services at issue in this case, securities regulations expressly confine customer interactions to one-on-one interactions based on

personal relationships rather than public advertising, and mandate that the companies' ensure their customers are individually qualified to purchase. The record evidence confirms that the companies' respective customers are highly sophisticated, ███████████████ investors who undertake lengthy review processes before making one-on-one investment decisions and thus are at no risk of confusion.    Indeed, Lion Capital itself admitted that confusion is "virtually inconceivable" when the parties' services are engaged.  A303.  It was straightforward legal error for the Board to ignore Lion Capital's critical concession given the record evidence and the requirements of federal law that, by virtually eliminating all prospect of confusion, required resolution of the likelihood-of-confusion inquiry in Stone Lion's favor.

Second, the Board committed additional legal errors in analyzing the similarity of the marks.  The Board started from the wrong point by deeming the incorporation of the terms of Lion Capital's marks as *ipso facto* indicating confusion.  Rather, it is the marks as a whole that are relevant, and that is precisely what makes STONE LION CAPITAL legally distinct from LION CAPITAL.

Likewise, the Board's dissection of the STONE LION CAPITAL mark and then backhanded dismissal of the word "Stone" as simply adding an adjective misses the legal relevance of that adjective, which connotes entirely different sound, meaning, connotation, and imagery for the customer.  Indeed, the Board's

17

decision is at war with Lion's Capital's prior USPTO admission that the adjective "Roaring" in front of "Lion" amply distinguished the ROARING LION mark from the LION and LION CAPITAL marks. That is especially true because the Board found that the Lion Capital marks are not strong or well-known in the financial services field, which means that even minor differences between the marks become more significant in avoiding the likelihood of confusion.

Finally, the Board's conclusion that the parties' purchasers are the same is legally flawed and is not supported by substantial evidence. Although the parties conduct business in the same field of private investments, broadly writ, the mere fact that the parties may deal with the same types of institutions does not establish overlap of purchasers. The Board ignored substantial evidence that purchasing institutions typically have different staff or advisors dealing with different investment asset classes, and that the parties' services cover different asset classes. The Board's likelihood of confusion finding is also legally flawed because it is based on likely confusion in the purchasing institutions, rather than in a particular customer as required by this Court's precedent.

Had the Court applied the *DuPont* factors properly and consistent with precedent to the undisputed—even conceded and legally required—factual evidence, Stone Lion's mark would have qualified for registration and the opposition would have been dismissed.

18

# ARGUMENT

## I.    STANDARD OF REVIEW.

A trademark opposition under Lanham Act Section 2(d) is determined on the likelihood of confusion factors set forth in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973).  Likelihood of confusion is a question of law with underlying factual inquiries based on the *DuPont* factors.  *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1382 (Fed. Cir. 2006).  The Court reviews the legal question of likelihood of confusion *de novo*, owing no deference to the Board's determination.  *On-Line Careline, Inc. v. America Online, Inc.*, 229 F.3d 1080, 1084 (Fed. Cir. 2000).

The Court reviews the Board's factual findings for "substantial evidence." *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003).  Substantial evidence must be "'more than a mere scintilla' and [is] 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  The Court may disturb the Board's factual findings if they are not supported by substantial evidence in the record.  *See Han Beauty, Inc. v. Alberto-Culver Co.,* 236 F.3d 1333, 1337 (Fed. Cir. 2001).

## II.  THERE IS NO LIKELIHOOD OF CONFUSION BETWEEN THE MARKS.

### A.  Legal Standard.

The well-established test for determining a likelihood of confusion involves the consideration and balancing of the thirteen, non-exclusive factors set forth in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973).[3] The *DuPont* factors must be considered and weighed within the particular factual context of the case, not a vacuum.  *In re DuPont*, 476 F.2d at 1361 (each case determining likelihood of confusion must be decided on its own facts).  In any given case, different factors may play a dominant role and some factors may not be relevant to the analysis.  *See Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1370 (Fed. Cir. 2002).  The weight given to each factor likewise depends on the

---

[3] The *DuPont* factors are:  (1) the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression; (2) the similarity or dissimilarity and nature of the goods described in an application or registration or in connection with which a prior mark is in use; (3) the similarity or dissimilarity of established, likely-to-continue trade channels; (4) the conditions under which and buyers to whom sales are made, *i.e.* "impulse" vs. careful, sophisticated purchasing; (5) the fame of the prior mark; (6) the number and nature of similar marks in use on similar goods; (7) the nature and extent of any actual confusion; (8) the length of time during and the conditions under which there has been concurrent use without evidence of actual confusion; (9) the variety of goods on which a mark is or is not used; (10) the market interface between the applicant and the owner of a prior mark; (11) the extent to which applicant has a right to exclude others from use of its mark on its goods; (12) the extent of potential confusion; and (13) any other established fact probative of the effect of use.

circumstances of each case. *See In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1406-1407 (Fed. Cir. 1997). Indeed, a single *DuPont* factor may be dispositive of the likelihood of confusion analysis. *Kellogg Co. v. Pack'em Enters., Inc.*, 951 F.2d 330, 333 (Fed. Cir. 1991).

This Court has ruled that likelihood of confusion analysis must be grounded in commercial reality, not speculation or theoretical supposition:

> We are not concerned with mere theoretical possibilities of confusion, deception, or mistake or with *de minimis* situations but with the practicalities of the commercial world, with which the trademark laws deal.

*Electronic Design & Sales, Inc. v. Electronic Data Sys. Corp.*, 954 F.2d 713, 717 (Fed. Cir. 1992) (citation omitted); *see also Edwards Lifesciences Corp. v. VigiLanz Corp.*, 94 U.S.P.Q.2d 1399, 1414 (T.T.A.B. 2010) ("We find that there is not a practical likelihood of confusion; rather the extent of any possible confusion is *de minimis*"); *Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas, Inc.*, 77 U.S.P.Q.2d 1492, 1513-1514 (T.T.A.B. 2005). That is because the statutory standard of Section 2(d) is *likelihood* of confusion, not the mere possibility of confusion. *Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*, 811 F.2d 1479, 1482 (Fed. Cir. 1987).

21

**B.     The Board Committed Legal Error in Dismissing Purchaser Sophistication and Conditions of Sale.**

This Court has emphasized that, when the disputed marks involve products or services offered in the same markets, purchaser sophistication is important and often dispositive because "[s]ophisticated consumers may be expected to exercise greater care." *Electronic Design & Sales*, 954 F.2d at 718.  "There is always less likelihood of confusion where goods are expensive and purchased after careful consideration," rather than on impulse.  *Id.* (quoting *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir. 1983)).

In this case, the extensive evidence of the regulatory environment, investor sophistication, and the circumstances surrounding investment decisions should have weighed heavily, if not foreclosed, any finding of likely confusion. Furthermore, just as in *Electronic Design & Sales*, the Board's failure to give proper weight to this vital part of the balance caused the Board to overvalue the marks in favor of Lion Capital.  954 F.2d at 718 n.2 ("The near identity of the marks here is apparent and is not seriously disputed.  But it too was given excessive weight by the Board in light of the sophistication of purchasers here."). Because of the extraordinarily high levels of purchaser sophistication and intimate and deliberative conditions of sale in this case, had the Board properly factored them into the *DuPont* balance, they would have dispositively foreclosed the likelihood of confusion finding or, at the very least, have tilted the balance heavily

in favor of Stone Lion.  Indeed, the evidence is so conclusive that Appellee Lion Capital readily conceded that likelihood of confusion by investors at the point of sale is "virtually inconceivable."  A303.

### 1.    The Board Gave No Legal Effect to the Extensive Evidence of Sophistication.

The Board made numerous factual findings establishing the unique sophistication of clientele for the parties' investment and financial services and the conditions of sale.  Specifically, the Board found that the "the parties' target investors are sophisticated, and the minimum required investments are large." A19.



The Board further found that both parties must have substantive, pre-existing relationships with the offeree and confirm that they are qualified to invest before making an offer.  A11.  Both parties market their services one-on-one, and "the evidence shows that identifying and procuring investors is a protracted and personal enterprise."  *Id.*  In that vein, the Board specifically found that "even ordinary consumers will exercise care when making financial decisions."  A19.

This finding comports with Appellee Lion Capital's concession that likelihood of confusion by investors at the point of sale is "virtually inconceivable."  A303.

The Board, however, failed to give the weight the law requires to the sophistication of clientele who would encounter the marks and completely ignored the conditions of sale.  *See, e.g., Electronic Sales & Design*, 954 F.2d at 718 ("Where the purchasers are the same, their sophistication is important and often dispositive because '[s]ophisticated consumers may be expected to exercise greater care.'") (quoting *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 489 (1st Cir. 1981)); *Dynamics Research Corp. v. Langenau Mfg. Co.*, 704 F.2d 1575, 1576 (Fed. Cir. 1983) (finding no likelihood of confusion between the identical mark DRC because the goods were "sold to different, discriminating customers****"); *Astra*, 718 F.2d at 1206 ("[T]here is always less likelihood of confusion where goods are expensive and purchased after careful consideration").

The Board reasoned that it must ignore that critical evidence because of the unrestricted description of services in the application and registrations involved. A19 ("The services offered by the parties, as identified in their respective application and registrations, are not restricted to high-dollar investments or sophisticated consumers.").  On that basis, the Board then cast aside Lion Capital's concession that no confusion would result at the point of sale and turned its back

on the exceptionally sophisticated clientele and meticulous decision-making processes employed by customers.  In fact, the Board turned the record on its head by counterfactually finding that the buyer's sophistication and the conditions under which sales are made (*i.e.,* "impulse" versus careful, sophisticated purchasing) somehow favored Lion Capital, even though the purchasing decisions made on this record are the antithesis of impulsive or unsophisticated.

That was straightforward legal error in four respects.  *First*, nothing in the law requires the Board to blink away such extensive evidence of purchaser sophistication and the extensively deliberated conditions of purchase just because the listed services contain no limitation as to trade channels or certain types of purchaser.  Indeed, this Court has found that purchaser sophistication and care can readily be inferred simply from an identification of goods or services that is not restricted as to trade channels or purchasers or value of products:

> Just from the record description of goods and services here one would expect that nearly all of opposer's and applicant's purchasers would be highly sophisticated.  Nothing in the record is to the contrary.  Indeed, the record confirms that opposer's services are expensive and purchased *only* by experienced corporate officials after significant study and contractual negotiation.

*See, e.g., Electronic Design & Sales*, 954 F.2d at 718; *see also In re Digirad Corp.*, 45 U.S.P.Q.2d 1841, 1843-44 (T.T.A.B. 1998).

In this case, the leveraged buyout, fund investment, investment advisory

services, and other investment and financial services identified in the application and registrations are the very type of services that would only be engaged by a knowledgeable and careful clientele.  Better still, because advertising is prohibited and investors must *as a matter of federal law* be confirmed by the companies to be qualified, the law itself answers this *DuPont* inquiry by requiring that investors have a substantive, pre-existing relationship with the investment services provider and be individually informed.  17 C.F.R. § 230.502(c).  This case is thus even stronger than *Electronic Designs* because federal law itself imposes the obligation of one-on-one, targeted customer relations for the parties' offerings.  The Board cannot ignore what federal law compels.  *See, e.g., Highfields Capital Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969, 978 (N.D. Cal. 2005) (finding no likelihood of confusion because "plaintiff considers itself to be a very sophisticated institution with responsibility (federally regulated) for very large investments on behalf of resource-rich, sophisticated clients").

*Second*, the Board overlooked that *DuPont* makes the sophistication and circumstances of purchase an independent factor separate from the services, trade channels and purchasing classes.  By collapsing those two factors into a single consideration, the Board's decision impermissibly rewrites *DuPont*.

*Third*, the Board's error is compounded by the robust factual record confirming a high level of expertise and deliberation within a decisional context

that is virtually immune from the possibility of confusion: ███████

███████████████████████████████████

███████████████████████████████████

███████████████████████████ The law obligated the Board to

give due weight to that evidence.  *See DuPont*, 476 F.2d at 1362 (the Board is

duty-bound to consider *all* the evidence); *Electronic Design & Sales*, 954 F.2d at

718 ("In every case turning on likelihood of confusion, it is the duty of the

examiner, the board and this court to find, upon consideration of *all* the evidence,

whether or not confusion appears likely").

*Fourth*, the testimonial admissions of Lion Capital's top executives that

customer confusion would not result because of the unique nature of these business

transactions should have been afforded great deference by the Board, not ignored.

After all, "[i]t is at least difficult to maintain a subjective view that confusion will

occur when those directly concerned say it won't."  *DuPont*, 476 F.2d at 1363;

*see also Amalgamated Bank of New York v. Amalgamated Trust & Savings Bank*,

842 F.2d 1270, 1275 (Fed. Cir. 1988) ("Decisions of [people] who stand to lose if

wrong are normally more reliable than those of examiners or judges");

*Bongrain Int'l (Am.) Corp.,* 811 F.2d at 1482 ("Our review of this case,

particularly considering the views of the parties on what actually happens and is

likely to happen in the marketplace as it affects their respective businesses,

constrains us to disagree with the board").

Unsurprisingly, given the concession, Lion Capital attempted to rest its entire case on a theory of "initial interest" confusion, A303, but the Board did not even entertain that theory.   And for good reason—this Court had refused to embrace it.  *See Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d 1546, 1549 (Fed. Cir. 1990) (declining to "reach or embrace" the concept of initial interest confusion as a ground of affirming the Board's finding of likelihood of confusion).[4]   Accordingly, because Lion Capital's point-of-sale concessions go directly to the central issue in the case, the Board committed reversible error in

_____

[4] Several other courts have concluded that initial interest confusion is not actionable under the Lanham Act.  *See, e.g., Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 582-583 (2d Cir. 1991) (initial confusion irrelevant where plaintiff supplied no link between confusion and eventual purchase decision); *Astra*, 718 F.2d at 1207 ("[T]emporary confusion that may have occurred regarding the identity of the salesmen had [no] effect whatever on the ultimate decision of a purchaser whether to buy a particular product."); *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117 (D. Mass. 1999) (temporary confusion "is not substantial enough to be legally significant."), *aff'd*, 232 F.3d 1, 2 (1st Cir. 2000) (applauding the lower court for its "refusal to enter the 'initial interest confusion' thicket"); *Alta Vista Corp., Ltd. v. Digital Equip. Corp.*, 44 F. Supp. 2d 72, 77 (D. Mass. 1998) (dismissing relevance of incidents of confusion where confusion did not affect purchase or sale). To the extent that other Circuits have concluded that initial interest confusion is relevant, the cases involve initial interest confusion from advertisements attracting the purchaser to the point of sale, and arise largely in the Internet context where an inadvertent click by an unsophisticated consumer could divert sales from the intended website.  *See, e.g.*, *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999) (a consumer intending to find plaintiff's website might instead stumble upon defendant's website and decide to stay there).  Neither of those theories has any traction in this highly sophisticated and deliberative transactional environment.

ignoring such vital evidence confirming not only the unlikelihood, but the virtual

impossibility, of confusion in the actual conditions in which the parties operate.

And that concession is firmly reinforced by the distinctive legal framework and

extensive record of sophisticated consumers making individualized and highly

informed judgments within the context of close, one-on-one relationships.

Moreover, in this case, client sophistication and the circumstances of sale so

overwhelm the context in which the marks are used that, certainly when combined

with the concessions, they should be dispositive in favor of Stone Lion.  *Id.*

("Where the purchasers are the same, their sophistication is important and often

dispositive").  At a minimum, it was plain legal error to ignore them.

### 2. *The Board Hypothesized a Second Class of Unsophisticated "Ordinary" Investors without Substantial Evidence.*

The Board rested its decision, in part, on the invocation of a hypothetical

scenario where Stone Lion's "investment advisory services and [Lion Capital's]

capital investment consultation *could be* offered to, and consumed by, anyone with

money to invest, including ordinary consumers seeking investment services."  A19

(quotation marks omitted; emphasis added).  But that is not how the law works.

Trademark oppositions are to be decided on the record before the Board, not made-

up speculation about a non-existent class of unsophisticated consumers comprising

"anyone with money to invest."  *Id*.  Indeed, the Board's purported customer base

is so entirely bereft of evidentiary support that no reasonable person would find

29

that the evidentiary record supports the Board's conclusion. *See On-Line Careline*, 229 F.3d at 1085.

Still worse, the Board's imagined class of "ordinary," unsophisticated investors took no account of the record facts that, even if such multi-millionaire but ignorant investors existed, their investment decisions would have to be made within a highly regulated, information-rich, one-on-one environment that by itself would make confusion *about source of the services provided* all but impossible. Both parties market their services one-on-one to individuals with whom they have a documented substantial and pre-existing relationship and whom they have independently determination are qualified under the investment regulations through a protracted and personal process. A10-11, ███████████████ ███ ███████ ██████ █████ █████ ████████ ████████ ████████ ██████ ████████ That presumably is why the Board itself admitted that "even ordinary consumers will exercise care when making financial decisions." A19. It thus was legal error for the Board to drop that entire half of the *DuPont* factor from its hypothesized analysis.

To be sure, the Board again professed that it was prevented from factoring that reality into its decision because the listed services were not limited to "high dollar investments or sophisticated consumers." A19. But the law does not support that distinction and, in any event, the regulations governing the parties'

investment services apply equally to all investors.  And the law as outlined in the securities regulations necessarily qualifies the purchasing context, so that registrants cannot claim a scope of use that the law forbids.

### 3.    The Board's Comparison of the Marks Was Predicated on Legal Error.

The Board's last rationale for discarding the extensive evidence of sophistication and circumstances of sale was to state that sophisticated purchasers are not immune from confusion where "similar marks" are used in connection with related services.  A19 (citing *In re Research and Trading Corp.*, 793 F.2d 1276, 1279 (Fed. Cir. 1986)).  But that misreads this Court's precedent.  The purported similarity of marks does not jettison evidence of sophisticated customers engaged in individualized one-on-one transactions. Rather, the Board was obligated to consider both the *extent* of similarity and dissimilarity along with the sophisticated transactional environment.  That is because confusion necessarily turns on degrees of sophistication combined with degrees of similarity.  The more sophisticated the consumer and individually in-depth the point-of-sale decision, the more substantial the similarity must be before confusion will result.

In *Research & Trading*, the marks were almost identical (ROPELOCK and ROPELOK) and the commercial circumstances were materially less sophisticated. 793 F.2d at 1279 ("Sophistication of buyers and purchaser care are relevant considerations, *but are not controlling on this factual record*.") (emphasis added).

31

Here, by contrast, the marks are far less similar and the transactional circumstances involve the highest level of sophistication and personalized, fact-to-fact deliberative judgments.

***** 

In short, at every turn, the Board committed legal error in casting aside the overwhelming evidence of extraordinary sophistication and the business circumstance of one-on-one long-term relationships that are both factually and legally designed to be impervious to confusion. The ripple effect of that error resulted in the Board miscalculating the *DuPont* balance that should have weighed heavily, if not dispositively, in favor of Stone Lion.

## B.    The Board Conducted An Erroneous Comparison of the Marks.

### 1.    *Incorporation of a Portion of Another's Mark Does Not Ipso Facto Constitute Confusing Similarity.*

To determine whether the parties' marks are similar for purposes of assessing the likelihood of confusion (the first *DuPont* factor), the Board must consider the appearance, sound, connotation and commercial impression of each mark. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1371 (Fed. Cir. 2005). In addition, this Court has long prohibited an analysis that dissects the marks rather than considers them as a whole. *See, e.g.*, *China Healthways Inst., Inc. v. Xiaoming Wang*, 491 F.3d 1337, 1340 (Fed. Cir. 2007) ("The marks must be compared in their entirety, at least

when the overall commercial impression is reasonably based on the entirety of the marks"); *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) ("[L]ikelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark."); *Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005, 1007 (C.C.P.A. 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion.").

While noting this Court's rules (A12), the Board's analysis undertook the very dissection of the mark that this Court forbids, failing to assess the commercial impression made by STONE LION CAPITAL as a whole and as applied to these investment services. *In re Nat'l Data Corp.,* 753 F.2d at 1058 ("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties.").

The Board began its analysis of the marks by noting that both parties have disclaimed the exclusive right to the term CAPITAL.  That was appropriate because "capital" is a generic term as applied to investment services.  A5167-68. As a result, disclaimed matter may properly be given only scant weight in the likelihood of confusion analysis. *Nat'l Data*, 753 F.2d at 1058.

The problem is that the Board then turned around and gave CAPITAL meaningful weight in its analysis by reasoning that the STONE LION CAPITAL mark "incorporates the *entirety* of [LION CAPITAL's] marks."  A13 (emphasis added).  The whole point of a disclaimer is to acknowledge that the term is non-distinctive and that others have a right to use the term apart from the disclaiming party's mark as a whole.  *Trademark Manual of Examining Procedure*, § 1213 (April 2013) ("A disclaimer is a statement that the applicant or registrant does not claim the exclusive right to use a specified element or elements of the mark in a trademark application or registration.").  Consistent with its disclaimer of exclusive rights in "CAPITAL," Lion Capital made no claim in this case that "CAPITAL" is anything other than a non-distinctive term describing its services.  A301-02. Thus Stone Lion's use of "CAPITAL" should have contributed very little to the likelihood of confusion analysis.

Furthermore, the Board's analysis rests on the faulty assumption that incorporating an opposer's mark necessarily results in a likelihood of confusion. But that is not the law, particularly where here the relevant transactional context admits of differentiation.   The cases that deny registration to a mark that incorporates the entire trademark of another "involve trademarks which when considered in their entireties would likely cause confusion." *Murray Corp. v. Red Spot Paint & Varnish Co., Inc.*, 280 F.2d 158, 161 n.4 (C.C.P.A. 1960)

34

(no likelihood of confusion found between marks EASY for touch-up enamel and EASYTINT for tintable base paints); *see also Colgate-Palmolive Co. v. Carter-Wallace, Inc.,* 432 F.2d 1400, 1402 (C.C.P.A. 1970) (no likelihood of confusion found between marks PEAK for dentifrice and PEAK PERIOD for personal deodorant).  Thus, contrary to the Board's analysis, mere inclusion of the terms LION and CAPITAL in Stone Lion's mark simply begins, but does not itself answer, the confusion inquiry.  Nor does it enhance the negligible contribution of the generic term CAPITAL or diminish the distinguishing impression of the initial term STONE as part of STONE LION CAPITAL.  It is that multi-faceted inquiry that the Board should have undertaken, and its failure to do so is reversible error.

### 2. *The Board Erred in Dismissing "STONE" as Merely an Adjective and Finding "LION" to be the Dominant Portion of STONE LION CAPITAL.*

The Board committed two more critical errors in its analysis.  *First*, it determined that the term LION, although "common," is arbitrary when used in association with Lion Capital's services.  A13-14. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ In so doing, the Board failed to follow the law's requirement that laudatory and suggestive terms are inherently weaker as marks than purely arbitrary or coined terms, and thus should be afforded

less scope in a likelihood of confusion analysis. *Nautilus Grp., Inc. v. ICON Health and Fitness, Inc*., 372 F.3d 1330, 1340 (Fed. Cir. 2004) ("Unlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak"); *Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp*., 135 U.S.P.Q. 45, 48 n.2 (2d Cir. 1962) ("The mark 'Triumph' is a so called weak mark, i.e. it has been used many times to identify many types of products and services."); *Union Carbide Corp. v. Ever Ready Inc*., 188 U.S.P.Q. 623, 637 (7th Cir. 1976) ("A distinctive mark or name will be more broadly protected than words such as 'ever ready' which has been registered and applied to a variety of goods"), *cert. denied*, 429 U.S. 830 (1976); *American Steel Foundries v. Robertson*, 269 U.S. 372, 383-384 (1926).

When a mark is weak, even slight differences between marks become more significant. *See, e.g.*, *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 352-353 (Fed. Cir. 1992); *Sure-Fit Prods. Co. v. Saltzson Drapery Co*., 254 F.2d 158, 159 (C.C.P.A. 1958) ("Where a party uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights.").

*Second*, at the conclusion of its marks analysis, the Board acknowledged that "STONE" appears first in the STONE LION CAPITAL mark and "contributes to its commercial impression." A13. The Board nonetheless concluded that LION is

36

the dominant element for no other reason than that STONE is an "adjective modifying the noun 'LION'." A13-14. That makes no sense. Whether a word is adjectival or not says nothing about either the distinctive contribution it makes to a mark as a whole or the unique import or imagery generated by the combined words. "Black" is just an adjective too, but when put in front of "hole," the combined effect of "black hole" is dramatically distinct from "hole" by itself. So too here, a "stone lion" connotes an entirely different image than just "lion." In failing to assess the full impression created by STONE and the "STONE LION" in STONE LION CAPITAL in the manner required by this Court's precedent, the Board committed legal error. *See Nat'l Data Corp.*, 753 F.2d at 1058 ("[T]he ultimate conclusion rests on consideration of the marks in their entireties"); *China Healthways Inst.*, 491 F.3d at 1340 (Marks analysis improper when "eliminating portions thereof and then simply comparing the residue.").

### 3. *Properly Analyzed, The Marks Are Readily Distinguishable and Non-Confusing in Context.*

The record contains substantial evidence that the marks are sufficiently distinguishable when used for the highly sophisticated investment services at issue in this case. "[I]t is often the first part of a mark which is likely to be impressed upon the mind of a purchaser and remembered," *Presto Prods., Inc. v. Nice-Pak Prods., Inc.*, 9 U.S.P.Q.2d 1895, 1897 (T.T.A.B. 1988), and the record documents that is true here as well. STONE LION, as the initial and dominant portion of the

STONE LION CAPITAL mark, is the most communicative and evocative aspect of the mark and that is what is likely to be remembered by investors. The STONE LION CAPITAL mark contains an initial sibilant sound not found in either of Lion Capital's marks. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

The meanings are also quite different. Stone Lion selected STONE LION CAPITAL as befitting a business operating within sight of the iconic stone lion statues "Patience" and "Fortitude" flanking the doorway of the New York Public Library (A4378-79), ████████████████████████████████

████████████████████████████████████████ Even without the correlation between the trademark and the New York Public Library landmark, the meaning of STONE LION, *i.e.*, a statue, and the connotation it creates of patience, courage, fortitude and strength (A4379, A4503) is obviously different than just LION, which communicates no such lithic signification (A5353). Further, LION denotes a living creature, a significance STONE LION does not have. Properly analyzed, both consistently with this Court's precedent and the record of very specialized customer decision-making, the sharp variations in the marks sound, appearance, meaning and connotation dispel any possibility of confusion.

### 4.    The Board Afforded Excessive Weight to the Similarity of the Marks.

Lastly, the Board committed legal error by according excessive weight to the perceived similarities between the marks.  In the first instance, having concluded that the Lion Capital marks are not strong or well-known in the financial services field, A14, the Board overlooked that the level of renown of an opposer's mark is supposed to play a "dominant role in the process of balancing the *DuPont* factors." *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000).  Under this Court's precedent, if a mark is not well-known, it is more difficult for a trademark owner to show likelihood of confusion.  *See Kenner*, 963 F.2d at 352-53 (stating that famous marks enjoy more protection).

Here, the Board assessed the strength of Lion Capital's marks "through, for example, evidence of sales, advertising and length of use," A14, and its findings support its conclusion that Lion Capital marks are not well-known.  The Board acknowledges that Lion Capital cannot advertise its services, A14, and Lion Capital offered no direct evidence of investor recognition of its marks.  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  Because Lion Capital's funds are large and "[a]bout two-thirds of the capital committed to its funds is from U.S. investors," A6, simple arithmetic shows that this handful of investors each committed multi-million euro

investments for which they participated in a face-to-face, highly-regulated investment process over a significant period of time.  Under those circumstances, the scope afforded by the Board to Lion Capital's largely unrecognized and certainly unrenowned marks was erroneous.  *See, e.g., Kenner,* 963 F.2d at 352-353 ("Where a party uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights") (quoting *Sure-Fit Prods.*, 254 F.2d at 160).

In addition, the Board afforded excessive weight to the marks' similarity in light of Lion Capital's own statements to the USPTO during the prosecution of the LION CAPITAL registration distinguishing the third party mark "ROARING LION" registered for, among others, venture capital funding services. Those statements did far more than add "shade and tone" to the analysis, as the Board noted, A17-18, but in fact evidenced that the scope of Lion Capital's marks is limited and that "consumers will look to *** elements [other than LION] to distinguish the source of the services," A17 (quoting A5054-59).

Indeed, "a party's earlier contrary opinion may be considered relevant and competent." *Specialty Brands, Inc. v. Coffee Bean Distribs.*, *Inc.*, 748 F.2d 669, 672-73 (Fed. Cir. 1984) ("A review of the record shows that applicant took a contrary position before the trademark examiner after being advised of the pending registration THE SPICE MARKET *** we consider this evidence to be relevant

because it illustrates the variety of images that may be attributed to the mark SPICE VALLEY, which applicant seeks to register without restriction as to display, and the overall commercial impression it projects"). Here, in its prior USPTO submission, Lion Capital considered ROARING LION—a mark that, after all, is distinguished by its *adjective*—to be different from LION and LION CAPITAL in "all aspects of the sight-sound-meaning trilogy":

> The composite mark "ROARING LION" conjures up a specific action and sound and is distinct from LION alone or other LION-formative marks.
>
> ***
>
> The notions suggested by ROARING are not passive or meek. The presence of a strong first term like ROARING therefore contributes significantly to the overall impression of the cited mark, and the weight of this portion cannot be overlooked or discounted.

A5054-59. Those statements are relevant evidence of the commercial impression created by LION and LION CAPITAL. STONE LION CAPITAL conjures up a specific impression of solidity, stability, and fortitude just as distinct from LION or LION CAPITAL as does ROARING LION. This evidence, along with the other record evidence, should have weighed in favor of Stone Lion in comparing the marks.

In sum, the critical facts are not just undisputed; the facts establishing lack of confusion at the point of sale are admitted. When properly analyzed under this

Court's precedent, the characteristics of the marks, considered in the highly specialized and sophisticated fora in which they are employed, preclude the Board's finding of likely confusion by the legally relevant consumers. Informed by the proper legal analysis and the extensive factual record, a proper balancing of the relevant *DuPont* factors would require reversal of the Board's decision and dismissal of the opposition.

### C.    The Board Erred in Analyzing the Purchasers and Trade Channels.

#### 1.    Likelihood of Confusion Must Exist in a Purchaser, Not Generally in an Institution.

In determining likelihood of confusion, the Board found that the third *DuPont* factor—the channels of trade and purchasers—weighed heavily in Lion Capital's favor. A10-11. Although the Board was correct that, where there are no restrictions in the application and registrations, the trade channels and classes of purchasers are determined by the description of services, *id.*, the Board's analysis stopped short. The fact that parties may provide their services to the same institutions does not, by itself, establish similarity of trade channels or overlap of customers. Rather, this Court had repeatedly held that the likelihood of confusion must be shown to exist not in a *purchasing institution*, but in 'a customer or purchaser." *Electronic Design & Sales*, 954 F.2d at 716 ("[A]ny confusion has to exist in the mind of a relevant person") (quoting *Astra*, 718 F.2d at 1206);

*Edwards Lifesciences*, 94 U.S.P.Q.2d at 1410 ("[O]pposer ignores the fact that the evidence shows that opposer markets to the staff of critical care units while applicant markets to hospital pharmacies *** the burden was on the opposer to submit evidence to the contrary"); *In re Digirad*, 45 U.S.P.Q.2d at 1844 ("[T]he differences in the relevant purchasers of the parties' goods, the sophistication of those purchasers, the care with which the products are purchased, and the expense thereof, mitigate against a finding that the goods of the parties are related, despite the fact that both x-ray imaging and nuclear imaging are medical diagnostic technologies ****").



The Board's failure to examine the record to determine *which types of persons* within these organizations the parties normally dealt with thus left out a critical element of this *DuPont* factor. *See Electronic Design & Sales*, 954 F.2d at 716-17.

### 2. The Board's Conclusion that the Purchasers Are the Same Is Not Supported By Substantial Evidence.

In this case, the evidence shows that the investment field is not monolithic, but is composed of separate functions within institutions having different investment goals and requirements.  A4413, A4800, A5340.  ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ Tellingly, the testimony of both parties concurred on this point.

████████████████████████████████████

████████████████████████████████████████

████████████████████████████ ████████████

████████████████████████████████████████

█████████ ████████████████████████████████

████████████████████████████████████████

████████████ ██████████████████████████████

████████████████████████████████████████

███████████    █████    ████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

█████████████████████████████

The Board's finding that the services would likely be encountered by the same relevant persons, A11, thus was both legal error—for failure to analyze the right individuals who were the purported objects of confusion—and factual error because the testimony of *both* sides was consistent on the lack of overlap between the relevant personnel. *See Astra*, 718 F.2d at 1207.  Accordingly, the Board's conclusion that the third *DuPont* factor weighed strongly in favor of Lion Capital cannot stand.

## CONCLUSION

For the foregoing reasons, Stone Lion respectfully requests that the Board's decision be reversed, the opposition dismissed, and a federal trademark registration for STONE LION CAPITAL be issued.

---

[5] It is appropriate for the Board to consider evidence that assists in understanding the nature of the recited goods or services. *See Edwards Lifesciences*, 94 U.S.P.Q.2d at 1410 ("Where, as here, applicant's description of goods provides basic information, and the goods are of a technical nature, it is entirely appropriate to consider extrinsic evidence to determine the specific meaning of the description of goods") (citing *In re Trackmobile, Inc.*, 15 U.S.P.Q.2d 1152, 1154 (T.T.A.B. 1990)).

Dated:  August 23, 2013                    Respectfully submitted,


                                           */s/ Karol A. Kepchar*
                                           Karol A. Kepchar
                                           Patricia A. Millett
                                           Ruthanne M. Deutsch
                                           Emily C. Johnson
                                           Akin Gump Strauss Hauer & Feld LLP
                                           Robert S. Strauss Building
                                           1333 New Hampshire Avenue, NW
                                           Washington, DC  20036-1564
                                           Phone:   (202) 887-4000
                                           Fax:      (202) 887-4288

                                           *Counsel for Appellant Stone Lion Capital
                                           Partners L.P.*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).   The brief contains 8,991 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).   The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type style.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of August, 2013, I electronically filed the foregoing with the Clerk of the Court using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


Dated:   August 23, 2013                */s/ Emily C. Johnson*
                                        Emily C. Johnson
                                        AKIN GUMP STRAUSS HAUER & FELD LLP
                                        Robert S. Strauss Building
                                        1333 New Hampshire Avenue, N.W.
                                        Washington, DC 20036
                                        Phone: (202) 887-4000
                                        Fax: (202) 887-4288
                                        johnsone@akingump.com

# ADDENDUM

# <u>ADDENDUM</u>

## TABLE OF CONTENTS

<u>Page</u>

Opinion, Trademark Trial and Appeal Board,
Mailed Jan. 18, 2013…………………………………………………ADD1

THIS OPINION IS NOT A
PRECEDENT OF THE TTAB

Mailed:
January 18, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Lion Capital LLP*
*v.*
*Stone Lion Capital Partners L.P.*
_____

Opposition No. 91191681
_____

Michael Chiappetta of Fross Zelnick Lehrman & Zissu PC for Lion Capital LLP.

Karol A. Kepchar and David C. Lee of Akin Gump Strauss Hauer & Feld LLP for Stone Lion Capital Partners L.P.
_____

Before Quinn, Kuhlke, and Hightower, Administrative Trademark Judges.

Opinion by Hightower, Administrative Trademark Judge:

On August 20, 2008, Stone Lion Capital Partners L.P. ("applicant") filed an intent-to-use application to register the mark STONE LION CAPITAL, in standard character form and with "CAPITAL" disclaimed, for "financial services, namely, investment advisory services, management of investment funds, and fund investment services."[1]  Lion Capital LLP ("opposer") opposes registration under

_____
[1] Application Serial No. 77551196.

Opposition 91191681

Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that applicant's mark, when used in connection with applicant's services, so resembles opposer's previously used and registered marks LION and LION CAPITAL for various financial services (collectively, "opposer's LION Marks") as to be likely to cause confusion. Both parties filed briefs, and opposer filed a reply brief.

<u>The Record</u>

The record comprises the pleadings and the file of the opposed application. The parties also stipulated to entry into evidence of a declaration of David E. De Leeuw, co-founder and managing director of third party Lion Chemical Capital LLC, and attached exhibits.

In addition, opposer has submitted the following evidence:

- Transcript of the testimonial deposition on written questions of Janet Dunlop, the chief operating officer of opposer, with exhibits. Portions of the deposition designated as confidential were bound and the pages numbered separately from non-confidential portions, which are designated herein as "Dunlop Conf. Tr." and "Dunlop Tr.," respectively;

- Transcript of the rebuttal testimonial deposition on written questions of Ms. Dunlop, with exhibits ("Dunlop Rebuttal Tr.")[2];

- Transcript of the testimonial deposition on written questions of Kelly Mayer ("Mayer Tr."), partner in opposer[3];

- Transcript of the testimonial deposition of Mario Ortiz, senior litigation paralegal for opposer's counsel, with exhibits;

- Excerpts from the discovery deposition of Danielle Schaefer, the chief financial officer of applicant, with exhibits (confidential);

---

[2] The Board denied applicant's motion to quash the rebuttal testimonial deposition of Ms. Dunlop on February 28, 2012.

[3] We hereby approve the stipulation the parties submitted on June 6, 2011 relating to the procedure for taking the Dunlop and Mayer depositions and certain evidence and testimony relating to Kelly Mayer.

Opposition 91191681

- Excerpts from applicant's responses to opposer's first and second set of interrogatories;

- Printouts of pages from opposer's website www.lioncapital.com; and

- Printouts and screenshots of pages from various websites relating to applicant's allegations of third-party use of LION-formative names in association with services in the investment field.

Applicant has submitted the following additional evidence:

- Transcript of the testimonial deposition of Danielle Schaefer ("Schaefer Tr."), with exhibits;

- Additional excerpts from the discovery deposition of Ms. Schaefer (confidential);

- Excerpts and exhibits from the discovery deposition of Mr. Mayer (confidential);

- Transcript of the testimonial deposition (with exhibits) of Jacob Capps ("Capps Tr."), a partner in opposer and president and director of Lion Capital (America) Inc., a U.S. subsidiary of opposer, as an adverse witness;

- Transcript of the testimonial deposition (with exhibits) of third party Roaring Blue Lion Capital Management, L.P., through its managing partner Charles William Griege, Jr., under subpoena and pursuant to FED. R. CIV. P. 30(b)(6) and 45;

- Certain of opposer's responses to applicant's requests for admission, interrogatories, and document requests;

- Printouts from the TARR database of 25 registrations on the Supplemental Register with the word "CAPITAL" disclaimed;

- Printouts of pages from various websites relating to applicant's allegations of third-party use of names containing both LION and CAPITAL in association with investment services; and

- File history of opposer's Registration No. 3543654 for LION CAPITAL.

Much of the evidence proffered by both parties has been designated confidential and filed under seal. Relevant evidence that has been submitted under

Opposition 91191681

seal and not disclosed by the parties in the unredacted portions of their public briefs will be discussed herein only in general terms.

Evidentiary Objections

Opposer has moved to strike the 74 pages of Internet evidence submitted with applicant's sixth notice of reliance, which are printouts of pages from various websites relating to applicant's allegations of third-party use of names containing both LION and CAPITAL in association with investment services. Opposer objects on the grounds that these documents are misleading, are not evidence of third-party use, and should not be accorded a presumption that the names shown therein are in actual use in connection with those services.

Similarly, applicant objects to three exhibits consisting of Internet printouts – comprising state corporate records and newspaper articles – submitted by opposer via notice of reliance. Applicant objects to the corporate records on the grounds of relevance and materiality, and to the newspaper articles on the basis of hearsay.

Each of the Internet documents subject to these objections follows the requirements of *Safer, Inc. v. OMS Investments, Inc.*, 94 USPQ2d 1031, 1039 (TTAB 2010). This evidence therefore is admissible not for the truth of the matter asserted, but for what the printouts show on their face and whatever probative value they may have. Where relevant, specific evidence is discussed *infra*.

Applicant also lodges several objections to opposer's testimony and deposition exhibits. While we have carefully considered each of applicant's objections, our rulings herein address only evidence that is relevant to our opinion and not

otherwise of record.[4]   In particular, applicant moves to strike portions of the transcripts of the testimonial deposition of Lion Capital's witness Kelly Mayer and the rebuttal testimonial deposition of opposer's witness Janet Dunlop, both of which were taken on written questions, as follows:

- Mayer Tr. 20:11-16:  Question number 12 asked: "Where are most of your investors located?"  The witness responded that about two-thirds, or 60%-70%, of the capital committed to opposer's first two funds was from investors in the United States.  Applicant is not specific, but it presumably objected that this testimony is non-responsive because the answer is provided in terms of capital rather than individuals or institutions.  We view the testimony as one way of responding to a somewhat vague question.  Applicant's motion to strike is denied.[5]

- Dunlop Rebuttal Tr. 13:25-14:6 and Exhibit 12 (filed under seal):  This testimony concerns an exhibit applicant contends was not produced until after its testimony period closed.  Opposer responds that it produced the document on July 26, 2011 and can prove it did so via a cover letter enclosing the document, which it did not submit but could provide at the Board's request.  Assuming that applicant is correct and the document was not timely produced, we will nonetheless consider the document and corresponding testimony for whatever probative value they may have in the nature of rebuttal evidence, given that the document was created after discovery closed and concerns use of a mark by a third party identified by applicant.  Furthermore, applicant had notice of the document before Ms. Dunlop's rebuttal testimonial deposition on written questions, as well as the opportunity to cross-examine the witness about it.

<u>The Parties</u>

Applicant is a New York-based investment advisor for hedge funds. Applicant's brief at 1.  Applicant "has managed a credit opportunities hedge fund

---

[4] Opposer states that it has not relied on a number of the challenged passages, or that they are not necessary to substantiate the propositions set forth in its briefs. We therefore have given that testimony no consideration.

[5] Of record, but designated as confidential, is an excerpt from the discovery deposition of the same witness in which he provided an estimated number of U.S. investors.

with a focus on event driven, distressed, high yield and special situations under the name 'Stone Lion Portfolio L.P.' since the fund's inception on November 6, 2008." *Id.*

Opposer, located in the United Kingdom, is an investment firm that seeks to make control investments in mid-sized and large consumer-oriented businesses in Europe and North America. Printout from opposer's website, Exhibit 101 to Capps Tr., at 2. Opposer's investments range "from equity and equity-like securities . . . to investments in debt securities both on a primarily issued basis or in some cases on a secondary basis." Mayer Tr. at 10:2-6. Opposer began using the LION and/or LION CAPITAL marks in the United States in April 2005. *Id.* at 12:11-19. Its investors include pension funds, fund to fund representation, individuals, and family offices. *Id.* at 19:14-22. Its primary form of investing is as a private equity house making investments on a private basis in companies, both equity and debt. *Id.* at 11:7-10. About two-thirds of the capital committed to its funds is from U.S. investors. *Id.* at 20:11-16. Opposer's investments include distressed debt. Dunlop Tr. at 10:11-11:22 and 31 (errata). Although some conflicting deposition testimony (designated as confidential) is of record, opposer asserts that it uses the marks LION and LION CAPITAL interchangeably in association with its services.[6]

<u>Standing and Priority</u>

Applicant does not dispute opposer's standing or priority. Opposer's standing to oppose registration of applicant's mark is established by its pleaded Registration

---

[6] Opposer's response to applicant's Interrogatory No. 31, submitted via applicant's Notice of Reliance, December 29, 2011.

Nos. 3543654 (LION CAPITAL) and 3645484 (LION), which the record shows to be valid and subsisting, and owned by opposer. *See, e.g., Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (party's ownership of pleaded registration establishes standing).

In addition, because opposer's pleaded registrations are of record, priority is not an issue with respect to the services covered by opposer's pleaded registrations. *Penguin Books Ltd. v. Eberhard*, 48 USPQ2d 1280, 1286 (TTAB1998) (citing *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974)). Specifically, opposer filed foreign application Serial No. 78627031 for LION CAPITAL on May 10, 2005 under Trademark Act Section 44(d), and Registration No. 3543654 issued under Trademark Act Section 44(e) on December 9, 2008; opposer filed foreign application Serial No. 77300323 for the mark LION on October 10, 2007 under Trademark Act Section 44(d), and Registration No. 3645484 issued under Trademark Act Section 44(e) on June 30, 2009. There is no dispute that opposer has priority vis-à-vis applicant, which filed the involved application on an intent-to-use basis on August 20, 2008 and has not attempted to establish priority of use for its mark STONE LION CAPITAL.

These services in opposer's pleaded registrations are:

- LION CAPITAL (Registration No. 3543654): "Equity capital investment; venture capital services, namely, providing financing to emerging and start-up companies; leveraged buy outs and investments in financially distressed or underperforming companies; real estate investment; hedge fund services"

- LION (Registration No. 3645484): "Financial services, namely, financial and investment planning and research, financial consultation, and assisting others with the completion of financial

Opposition 91191681

> transactions for stocks, bonds, securities and equities; venture capital services, namely, providing financing to emerging and start-up companies; leveraged buy outs and investments in financially distressed or under performing companies; real estate affairs, namely, real estate investment services; equity capital investment; investment services, namely, investment management services, mutual fund and hedge fund investment services, management of a capital investment fund, capital investment consultation and financial trust operations; trust services, namely, investment and trust company services; advisory and consultancy services relating to corporate finance and venture capital services; investment in the field of private equity, venture capital and specialized funds and other funds; advising on and managing investments; private equity investment management; buying, selling and holding of securities; investment management services relating to acquisitions and mergers; management of equity and debt investment portfolios; investment asset management"

All of the services identified in both registrations are in International Class 36.

## Likelihood of Confusion

"We determine likelihood of confusion by focusing on . . . whether the purchasing public would mistakenly assume that the applicant's [services] originate from the same source as, or are associated with, the [services] in the cited registrations." *In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). We consider all probative facts in evidence which are relevant to the likelihood of confusion factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). Opposer must establish that there is a likelihood of confusion by a preponderance of the evidence. *Cunningham*, 55 USPQ2d at 1848.

The parties have presented evidence as to the following *du Pont* factors: similarity of the parties' marks (factor 1); similarity of their services (factor 2); similarity of trade channels (factor 3); the conditions under which and buyers to

Opposition 91191681

whom sales are made, i.e., consumer sophistication (factor 4); the strength of opposer's marks (factor 5); and the number and nature of similar marks in use on similar goods (factor 6). The parties essentially agree that the *du Pont* factors relating to actual confusion (factors 7 and 8) are neutral.

A.   Similarity of the Services

We first address the similarities or differences between opposer's and applicant's services, the second *du Pont* factor. It is settled that in making our determination regarding the relatedness of the parties' services, we must look to the services as identified in the application and opposer's pleaded registrations. *See Octocom Sys., Inc. v. Houston Computer Servs., Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). That is, because the scope of the registration applicant seeks is defined by its application (not by its actual use), it is the application (not actual use) that we must look to in determining applicant's right to register:

> The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods are directed.

*Id*. It is sufficient if a likelihood of confusion is found with respect to use of applicant's mark on any item that comes within the description of services in the application or registration. *Tuxedo Monopoly, Inc. v. General Mills Fun Group, Inc.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981); *Apple Computer v. TVNET.net, Inc.*, 90 USPQ2d 1393, 1397 (TTAB 2007).

Opposition 91191681

Applicant operates a hedge fund. Its application, however, covers much broader services: "financial services, namely, investment advisory services, management of investment funds, and fund investment services." The parties have introduced extensive evidence regarding the similarities and differences between the services they actually offer. The issue before us, however, is whether the services *as identified in the application* overlap with the services *as identified in opposer's pleaded registrations*.

The financial services identified in opposer's Registration No. 3645484 for LION include "management of a capital investment fund" and "capital investment consultation." Opposer has established that it is offering these services in interstate commerce. Applicant's identification "management of investment funds" encompasses opposer's identification "management of a capital investment fund" and applicant's "investment advisory services" encompasses opposer's "capital investment consultation." Thus, opposer's services are legally identical to applicant's "financial services, namely, investment advisory services, management of investment funds, and fund investment services."

The similarity of the parties' services weighs strongly in favor of a likelihood of confusion.

B.    <u>Channels of Trade</u>

The third *du Pont* factor considers the similarity of the trade channels for the parties' services. A significant amount of the evidence submitted by the parties – some of it confidential – is directed to the channels of trade for their services, as well as conditions of sale, discussed *infra*. Suffice it to say that the parties agree

Opposition 91191681

that, by law, they cannot advertise or make general solicitations for investors; they must have a substantive pre-existing relationship with the offeree and confirm that they are qualified to invest before making an offer. *See* Applicant's Brief at 6 n.7. Both parties market their services one-on-one, and the evidence shows that identifying and procuring investors is a protracted and personal enterprise.

Because there are no limitations to the recitation of services in the application or opposer's registrations as to channels of trade and classes of purchasers, we must presume that the parties' services travel through all usual channels of trade and are offered to all normal potential purchasers. *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981); *see also Paula Payne Prods. Co. v. Johnson Publ'g Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973).

Moreover, because the services described in the application and opposer's registrations are in part legally identical, we must presume that the channels of trade and classes of purchasers are the same. *See American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute*, 101 USPQ2d 1022, 1028 (TTAB 2011); *In re Smith & Mehaffey*, 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers.").

*Du Pont* factor three therefore weighs strongly in opposer's favor.

C.    Similarity of the Marks

We turn next to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of "'the marks in their entireties as to appearance, sound, connotation, and commercial impression.'" *Palm Bay Imports Inc. v. Veuve Clicquot*

Opposition 91191681

*Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). In comparing the marks, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether they are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result. *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd,* No. 92-1086 (Fed. Cir. June 5, 1992).

Because the similarity or dissimilarity of the marks is determined based on the marks in their entireties, our analysis cannot be predicated on dissecting the marks into their various components; that is, the decision must be based on the entire marks, not just part of the marks. *In re Nat'l Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985); *see also Franklin Mint Corp. v. Master Mfg. Co.,* 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion."). On the other hand, different features may be analyzed to determine whether the marks are similar. *Price Candy Co. v. Gold Medal Candy Corp.,* 220 F.2d 759, 105 USPQ 266, 268 (CCPA 1955). In fact, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate

Opposition 91191681

conclusion rests on a consideration of the marks in their entireties. *In re Nat'l Data Corp.*, 224 USPQ at 751.

We also note that where, as here, the services are closely related, the degree of similarity necessary to find likelihood of confusion need not be as great as where there is a recognizable disparity between the services. *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992); *Jansen Enters. Inc. v. Rind,* 85 USPQ2d 1104, 1108 (TTAB 2007).

Applicant's mark is STONE LION CAPITAL, while opposer's marks are LION and LION CAPITAL.  Both parties have disclaimed the word "CAPITAL" from their respective marks.  It is well-settled that disclaimed, descriptive matter may have less significance in likelihood of confusion determinations.  *See Cunningham*, 55 USPQ2d at 1846 ("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'") (quoting *In re Nat'l Data Corp.,* 224 USPQ at 752); *In re Dixie Rests. Inc.,* 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997); *In re Code Consultants, Inc.,* 60 USPQ2d 1699, 1702 (TTAB 2001) (disclaimed matter is often "less significant in creating the mark's commercial impression").

In this case, applicant's mark incorporates the entirety of opposer's marks, and the common term "LION" is arbitrary in association with the parties' services. Although the word "STONE" appears first in applicant's mark and contributes to the mark's commercial impression, it is an adjective modifying the noun "LION,"

Opposition 91191681

which we view as the dominant part of both parties' marks. We find in this case
that the addition of the word "STONE" is not sufficient to distinguish the marks in
the context of the parties' services, and we find them to be similar in sight, sound,
meaning, and overall commercial impression. The similarity of the parties' marks
weighs in favor of a likelihood of confusion.

D.    Strength of Opposer's Marks

       *Du Pont* factor five assesses the strength of opposer's marks through, for
example, evidence of sales, advertising, and length of use. As noted, although
opposer's capital investment funds are large, opposer is prohibited from advertising
its services. Its marks have been in use in the United States since 2005. Mayer Tr.
at 12:13-19. Opposer submitted evidence that some news about its investments has
been published in The Wall Street Journal and The New York Times, as well as on
Dow Jones Newswire, CNNMoney.com, FoxBusiness.com, and Forbes.com, among
other publications. Dunlop Conf. Tr. at 17-18 and Exh. 7-8.[7] Applicant, in turn,
argues that "Lion Capital's business in the United States has involved only a few
dozen investors and minimal press coverage." Applicant's Brief at 19.

       Opposer has not established that its marks are well-known in the financial
services field. We view this *du Pont* factor as neutral.

E.    Number and Nature of Similar Marks in Use for Similar Services

       Applicant has made of record the testimony deposition of one third party and
a sworn declaration from another. Both provide specific fund investment services.

---

[7] Opposer notes that this testimony and these exhibits were erroneously designated as
confidential and may be publicly disclosed. Opposer's Brief at 9 n.3.

Opposition 91191681

These are Roaring Blue Lion Capital Management, L.P., which has used the mark BLUE LION CAPITAL since 2005 in connection with hedge fund services, and Lion Chemical Capital, LLC. The latter company is a private equity firm that provides equity capital investment services, targeting investment opportunities in the chemical and related industries. Declaration of Third Party Lion Chemical Capital LLC at 1 ¶ 3. It has used the mark LION CHEMICAL CAPITAL in connection with its services since 2001. *Id.* at 2 ¶ 9. Lion Chemical Capital refers to itself in marketing materials as "LION." *Id.,* Exh. 2 at LCC019-20, LCC022. It has been the subject of U.S. press coverage. *Id.,* Exh. 4.

In addition, opposer entered into a consent agreement with the owner of the mark LIONESS CAPITAL PARTNERS & Design, registered for "private equity financing and venture capital investment services" in International Class 36,[8] which had been cited against opposer's application for LION CAPITAL.[9] On deletion of "Capital" from its applied-for mark, opposer also consented to the use and registration of LION HOUND for "investment management services; fund investment services; hedge fund investment services" by Lion Hound Capital L.P.[10] *See* Applicant's Brief at 12; Reply Brief at 20. There is no record evidence regarding the degree of consumer awareness of the LIONESS CAPITAL PARTNERS & design and LION HOUND marks.

---

[8] Registration No. 2715598.

[9] *See* Response to Office Action, May 27, 2008, Registration No. 3543654, submitted with applicant's first notice of reliance, filed December 29, 2011.

[10] Registration No. 3985974.

Opposition 91191681

Applicant also submitted Internet printouts referencing other third parties, as follows: Liongate Capital Management; LionEye Capital Management LLC; Lion's Path Capital; Lion Capital Group; Blue Lion Capital Management, L.L.C.[11]; LionStone Capital Mngmnt; Lion Capital Investment Group; Lion Capital LLC; Sea Lion Capital Management LLC; Lion Capital Holdings, Inc.; Lion Capital Management Ltd.; Lion Pride Capital Partners LLC; Lion Capital Partners, L.P.; and Lion Share Capital LLC. Applicant has not established length or extent of use of these names. With its rebuttal notice of reliance submitted February 14, 2012, and the deposition transcript of Mario Ortiz, with exhibits, Opposer submitted Internet printouts calling into question the current status of several of these purported uses. On the other hand, the record includes testimony (designated as confidential) that opposer is aware of and has tolerated some of these uses of LION-formative marks in association with investment services by third parties.[12]

On its face, third-party evidence like that submitted by applicant shows "that the public may have been exposed to those internet websites" and therefore may be aware of the marks used therein. *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1072 (TTAB 2011). Such evidence generally has minimal probative value where, as here, it is not accompanied by any evidence of consumer awareness.

---

[11] Record evidence suggests that this reference is distinct from Roaring Blue Lion Capital Management, L.P., which testified under subpoena.

[12] However, "it is entirely reasonable for the opposer to object to the use of certain marks in use on some goods which it believes would conflict with the use of its marks on its goods and services while not objecting to use of a similar mark on other goods which it does not believe would conflict with its own use." *McDonald's Corp. v. McKinley,* 13 USPQ2d 1895, 1899-1900 (TTAB 1989).

Opposition 91191681

*See Penguin Books Ltd.*, 48 USPQ2d at 1284 n.5 (noting that white pages listings do not show that the public is aware of the companies).

Applicant also submits evidence that opposer has changed its position with respect to third-party LION-formative marks. The file history for Registration No. 3543654, opposer's LION CAPITAL mark, includes a response to an Office action submitted May 23, 2008, in which opposer made extensive arguments as to why confusion was unlikely between its mark and the cited mark ROARING LION.[13] Opposer argued in that response that the marks made different commercial impressions, demonstrated by the cited registration's coexistence on the Register "with <u>numerous</u> other LION marks in Class 36."[14] Opposer concluded that its

> search of the Patent and Trademark Office database shows that here are over forty registered or approved LION marks in Class 36, owned by numerous different third parties. . . . ***These coexisting third-party registrations and approved publications are relevant to show that, given the field of LION marks, consumers will look to other elements to distinguish the source of the services.*** Furthermore, where a search of the Office's records locates numerous marks owned by different third parties, TMEP § 1207.01(d)(x) states that the examining attorney "should consider the extent to which dilution may indicate that there is no likelihood of confusion." ***Applicant submits that the successful coexistence of third-party LION marks on the Register in Class 36 demonstrates the Patent and Trademark Office's recognition that even small variations in overall appearance can suffice to prevent consumer confusion.***[15]

---

[13] Registration No. 2948611.

[14] Applicant's first notice of reliance, submitted December 29, 2011, "Request for Removal from Suspension," at unnumbered p. 3.

[15] *Id.* at unnumbered p. 5 (emphases added) (citation omitted).

We do not construe opposer's previous legal opinion by itself as conclusive on the issue of the diluted nature of its marks. *See Top Tobacco, L.P. v. North Atlantic Operating Co.*, 101 USPQ2d 1163, 1172 (TTAB 2011). Rather, we have considered opposer's earlier arguments to be "illuminative of shade and tone in the total picture confronting the decision maker." *Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 198 USPQ 151, 154 (CCPA 1978); *see also Anthonys Pizza & Pasta Int'l, Inc. v. Anthonys Pizza Holding Co.*, 95 USPQ2d 1271, 1281 (TTAB 2009) (same), *aff'd*, 415 Fed. Appx. 222 (Fed. Cir. 2010).

Notwithstanding opposer's earlier analysis, we cannot conclude that the record contains sufficient probative evidence of third-party use to establish a crowded field of LION-formative marks for similar investment services. *See, e.g., AutoZone Parts, Inc. v. Dent Zone Cos.*, 100 USPQ2d 1356, 1364-65 (TTAB 2011) (three third-party uses of ZONE marks, with no evidence of extent of use or promotion, did not prove AUTOZONE weak); *cf. Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d 1492, 1510 (TTAB 2005), *aff'd*, 479 F.3d 825, 81 USPQ2d 1919 (Fed. Cir. 2007) (testimony from 12 third parties established a crowded healthcare field for the descriptive terms "care" and "first").

The number of LION-formative marks with evidence relating to their actual use in association with similar services is small. Moreover, while the third-party marks limit the scope of protection for opposer's marks, each mark registered or confirmed to be in use for similar services makes a commercial impression less similar to opposer's LION Marks than does applicant's mark. Applicant has not

established that the investment services field is crowded with LION-formative marks, such that consumers for legally identical services are accustomed to distinguishing among them based on relatively small differences in the marks. We find that *du Pont* factor six is therefore neutral.

F.    Conditions of Sale and Consumer Sophistication

Turning to the final factor relevant here, the fourth *du Pont* factor considers the conditions under which and buyers to whom sales are made. The evidence establishes that the parties' target investors are sophisticated, and the minimum required investments are large. We must point out again, however, that we are constrained to consider the parties' services as they are recited in the application and registrations, respectively. The services offered by the parties, as identified in their respective application and registrations, are not restricted to high-dollar investments or sophisticated consumers. Rather, applicant's "investment advisory services" and opposer's "capital investment consultation" could be offered to, and consumed by, anyone with money to invest, including ordinary consumers seeking investment services.

Evidence regarding the sophistication of consumers of the parties' services is not determinative in view of the services as identified in the application and the registration. Although even ordinary consumers will exercise care when making financial decisions, careful or sophisticated purchasers are not immune from source confusion where similar marks are used in connection with related services. *See In re Research & Trading Corp.*, 793 F.2d 1276, 230 USPQ 49, 50 (Fed. Cir. 1986) ("'Human memories even of discriminating purchasers . . . are not infallible.'")

Opposition 91191681

(quoting *Carlisle Chem. Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970)). In light of applicant's identification of services, we find that *du Pont* factor four weighs in opposer's favor.

Weighing the Factors

Applicant proposes to register a mark that is similar to opposer's LION Marks for legally identical services offered to the same customers through the same channels of trade. *Du Pont* factors one through four thus weigh in opposer's favor, while the remaining *du Pont* factors are neutral.

On balance, we find that opposer has established by a preponderance of the evidence that applicant's mark STONE LION CAPITAL is likely to cause confusion with opposer's marks LION and LION CAPITAL when used in association with the parties' respective investment services. To the extent we have doubt, it must be resolved in favor of the prior registrant. *Nike Inc. v. WNBA Enters. LLC,* 85 USPQ2d 1187, 1202 (TTAB 2007); *Hard Rock Cafe Int'l (USA) Inc. v. Elsea,* 56 USPQ2d 1504, 1514 (TTAB 2000).

*Decision*: The opposition is sustained and registration to applicant is refused.