**2013-1353**

**(OPPOSITION NO. 91191681)**

*In The*

# United States Court of Appeals

### For The Federal Circuit

## STONE LION CAPITAL PARTNERS, L.P.,

*Appellant*,

## v.

## LION CAPITAL LLP,

*Appellee*.

**APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD**

————————————

## CORRECTED NON-CONFIDENTIAL BRIEF OF APPELLEE

————————————

**Michael Chiappetta**
**FROSS, ZELNICK, LEHRMAN & ZISSU, P.C.**
**866 United Nations Plaza**
**New York, New York  10017**
**(212) 813-5900**

*Counsel for Appellee*                    *Dated:  November 1, 2013*

**THE LEX GROUP**[DC] ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C.  20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Stone Lion Capital Partners, L.P.    v.  Lion Capital LLP

No. 2013-1353

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Lion Capital LLP _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Lion Capital LLP

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Lion Capital LLP

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Michael Chiappetta
Fross Zelnick Lehrman & Zissu, P.C.
866 United Nations Plaza, New York, NY 10017

**May 9, 2013**
_____
Date

**/s/ Michael Chiappetta**
_____
Signature of counsel
**Michael Chiappetta**
_____
Printed name of counsel

Please Note: All questions must be answered

cc: _____

124

# CERTIFICATE OF SERVICE

**2013-1353**
**(Opposition No. 91191681)**
**STONE LION CAPITAL PARTNERS, L.P.**
v.
**LION CAPITAL LLP**

The undersigned hereby certifies that a true and complete copy of the foregoing CERTIFICATE OF INTEREST has been served via first class mail, postage prepaid and placed in an official depository under exclusive care and custody of the United States Postal Service within the State of New York to the following counsel for appellant Stone Lion Capital Partners, LP:

Karol Kepchar, Esq.
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW, Suite 400
Washington D.C. 20036-1564

DATED:  May 9, 2013                    /s/ Michael Chiappetta
                                       Michael Chiappetta

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF RELATED CASES ................................................... ix

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ON APPEAL ...................................... 2

STATEMENT OF THE FACTS ............................................................. 4

    A.    The LION CAPITAL Marks and Registrations ..................................... 4

    B.    Lion Capital's Investment Services Under the LION CAPITAL Marks ................................................................................................. 5

    C.    Applicant Stone Lion Capital ............................................................. 8

SUMMARY OF THE ARGUMENT ..................................................... 10

ARGUMENT ....................................................................................... 12

    A.    STANDARD OF REVIEW ................................................................. 12

    B.    REGISTRATION OF *STONE LION CAPITAL* IS LIKELY TO CAUSE CONFUSION WITH THE *LION CAPITAL* MARKS .......... 13

        1.    Principles Governing Weighing of the Likelihood of Confusion Factors ................................................................. 15

        2.    The Board Correctly Held That The STONE LION CAPITAL Mark Is Similar To The LION CAPITAL Marks .... 16

            a.    Legal Principles Relevant to the Similarity of the Marks Analysis ............................................................. 17

            b.    The Board Properly Compared The Marks In Their Entireties ...................................................................... 20

            c.    The Board Did Not Give Excessive Weight To The Similarity of the Marks Factor. .................................... 25

i.      Stone Lion Capital's Legal Argument Is Unsupported By Law ............................................26

ii.     The Board Did Not Find The LION CAPITAL Marks Weak – In Fact The Marks Are At Least Conceptually Strong ......................27

iii.    Lion Capital's Statements to the USPTO 5 Years Ago Are Of Minimal Relevance................32

3.     The Board Properly Assessed Consumer Sophistication and Conditions of Sale ..............................................33

a.    Stone Lion Capital's Conditions of Sale / Consumer Sophistication Argument Ignores Their Broad Identification of Services. ....................................34

b.    Even Taking Into Account The Sophistication and Diligence of Investors In The Parties' Current Funds, Confusion Is Likely ............................................40

4.     The Board's Assessment of the Relevant Purchasers and Trade Channels Was Proper. ......................................47

C.    STONE LION CAPITAL MISREPRESENTS THE RECORD WITH RESPECT TO USE OF LION-VARIANT MARKS BY THIRD PARTIES.................................................................52

CONCLUSION ......................................................................56

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

## STATEMENT REGARDING CONFIDENTIAL MATERIAL OMITTED

This Appeal is subject to the Standard Protective Order of the Trademark Trial and Appeal Board made effective in the case that gives rise to this appeal, namely Opposition No. 91191681 – *Lion Capital LLP v. Stone Lion Capital Partners, L.P.*, pursuant to 37 C.F.R. § 2.116(g).  In compliance with that Standard Protective Order, confidential information has been omitted from the following pages of this brief: 6-9, 40, 47 and 49-51.  All omitted material is CONFIDENTIAL or TRADE SECRET / COMMERCIALLY SENSITIVE, as defined by the Standard Protective Order, and is to be disclosed only in accordance with the Standard Protective Order.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alfacell Corp. v. Anticancer, Inc.*,
    71 U.S.P.Q.2d 1301 (T.T.A.B. 2004)............................................................36

*American Lebanese Syrian Associated Charities, Inc. v.
Child Health Research Institute*,
    101 U.S.P.Q.2d 1022 (T.T.A.B. 2011).............................................. 27-28, 29

*Anthony's Pizza and Pasta International, Inc. v.
Anthony's Pizza Holding Co.*,
    95 U.S.P.Q.2d 1271 (T.T.A.B. 2009), *aff'd*,
    415 F. App'x. 222 (Fed. Cir. 2010).........................................................32, 53

*AutoZone Parts, Inc. v. Dent Zone Companies*,
    100 U.S.P.Q.2d 1356 (T.T.A.B. 2011).........................................................39

*Bose Corp. v. QSC Audio Products, Inc.*,
    293 F.3d 1367 (Fed. Cir. 2002) ..................................................................22

*Bridgestone Americas Tire Operations, L.L.C. v. Federal Corp.*,
    673 F.3d 1330 (Fed. Cir. 2012) .......................................................15, 17, 18

*Centraz Industries, Inc. v. Spartan Chemical Co.*,
    77 U.S.P.Q.2d 1698 (T.T.A.B. 2006).................................................... 17-18

*Century 21 Real Estate Corp. v. Century Life of America*,
    970 F.2d 874 (Fed. Cir. 1992) ....................................................................17

*Citigroup Inc. v. Capital City Bank Grp., Inc.*,
    637 F.3d 1344 (Fed. Cir. 2011) ..................................................................12

*Cunningham v. Laser Golf Corp.*,
    222 F.3d 943 (Fed. Cir. 2000) ....................................................................35

*Del Laboratories, Inc. v. Alleghany Pharmacal Corp.*,
    516 F. Supp. 777 (S.D.N.Y. 1981) ................................................................30

*Dynamics Research Corp. v. Langenau Manufacturing Co.*,
    704 F.2d 1575 (Fed. Cir. 1983) ................................................................38

*Electronic Design and Sales, Inc. v. Electronic Data Systems Corp.*,
    954 F.2d 713 (Fed. Cir. 1992) ................................................*passim*

*Frehling Enterprises, Inc. v. International Select Group, Inc.*,
    192 F.3d 1330 (11th Cir. 1999) ................................................................31

*General Mills Inc. v. Fage Dairy Processing Industry S.A.*,
    100 U.S.P.Q.2d 1584 (T.T.A.B. 2011) ................................................36

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ................................................16, 26

*H.D. Lee Co. v. Maidenform, Inc.*,
    87 U.S.P.Q.2d 1715 (T.T.A.B. 2008) ................................................36

*Hard Rock Cafe International (USA), Inc. v. Elsea*,
    56 U.S.P.Q.2d 1504 (T.T.A.B. 2000) ................................................21

*Henry Siegel Co. v. M & R International Manufacturing Co.*,
    4 U.S.P.Q.2d 1154 (T.T.A.B. 1987) ................................................21

*Hrl Associates Inc. v. Weiss Associates Inc.*,
    12 U.S.P.Q.2d 1819 (T.T.A.B. 1989) ................................................44

*Hunt Control Systems Inc. v. Koninklijke Philips Electronics. N.V.*,
    98 U.S.P.Q.2d 1558 (T.T.A.B. 2011) ................................................16, 21, 26

*In re Chippendales USA, Inc.*,
    622 F.3d 1346 (Fed. Cir. 2010) ................................................12

*In re Digirad Corp*,
    45 U.S.P.Q.2d 1841 (T.T.A.B. 1998) ................................................38

*In re E. I. du Pont de Nemours & Co.*,
    476 F.2d 1357 (C.C.P.A. 1973)............................................................*passim*

*In re Elbaum*,
    211 U.S.P.Q. 639 (T.T.A.B. 1981)................................................................47

*In re Lion Global Investors Ltd.*,
    App. Ser. No. 79063620 (T.T.A.B. May 9, 2012) ............................ 28, 29-30

*In re Mighty Leaf Tea*,
    601 F.3d 1342 (Fed. Cir. 2010) ....................................................................17

*In re Nett Designs, Inc.*,
    236 F.3d 1339 (Fed. Cir. 2001) ....................................................................29

*In re Opus One, Inc.*,
    60 U.S.P.Q.2d 1812 (T.T.A.B.  2001)............................................................36

*In re Pacer Technology*,
    338 F.3d 1348 (Fed. Cir. 2003) ....................................................................28

*In re Rexel Inc.*,
    223 U.S.P.Q. 830 (T.T.A.B. 1984)................................................................21

*In re Research and Trading Corp.*,
    793 F.2d 1276 (Fed. Cir. 1986) ........................................................19, 38, 39

*In re Toshiba Medical Systems Corp.*,
    91 U.S.P.Q.2d 1266 (T.T.A.B. 2009)......................................................21, 23

*In re Viterra Inc.*,
    671 F.3d 1358 (Fed. Cir. 2012) ........................................................12, 17, 19

*Interstate Brands Corp. v. Celestial Seasonings, Inc.*,
    576 F.2d 926 (C.C.P.A. 1978)......................................................................32

*Joel Gott Wines L.L.C. v. Rehoboth Von Gott Inc.*,
    107 U.S.P.Q.2d 1424 (T.T.A.B. 2013)..........................................................18

*K2 Advisors*, *L.L.C. v. K2 Volatility Fund*, *LP*,
    01-CV-3984 (AGS),
    2002 WL 31235701 (S.D.N.Y. Oct. 4, 2002)....................................42, 46, 50

*Kenner Parker Toys Inc. v. Rose Art Industries*, *Inc.*,
    963 F.2d 350 (Fed. Cir. 1992) ................................................................15, 16

*L'Oreal S.A. v. Marcon*,
    102 U.S.P.Q.2d 1434 (T.T.A.B. 2012)....................................................14, 35

*Lane Capital Management Inc. v. Lane Capital Management*, *Inc.*,
    15 F. Supp. 2d 389 (S.D.N.Y. 1998) ...........................................................51

*Lexington Management Corp. v. Lexington Capital Partners*,
    10 F. Supp. 2d 271 (S.D.N.Y. 1998) ...........................................................51

*M2 Software, Inc. v. M2 Communications*, *Inc.*,
    450 F.3d 1378 (Fed. Cir. 2006) ...................................................................12

*McGregor-Doniger*, *Inc. v. Drizzle Inc.*,
    599 F.2d 1126 (2d Cir. 1979) ......................................................................19

*Miss Universe L.P. v. Community Marketing*, *Inc.*,
    82 U.S.P.Q.2d 1562 (T.T.A.B. 2007)....................................................21, 23

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987) ........................................................................45

*Montana Professional Sports*, *L.L.C. v. Leisure Sports Management*, *Inc.*,
    422 F. Supp. 2d 1271 (M.D. Fla. 2006) ................................................. 24-25

*Morningside Group Ltd. v. Morningside Capital Group*, *L.L.C.*,
    182 F.3d 133 (2d Cir. 1999) .................................................................*passim*

*Nina Ricci*, *S.A.R.L. v. E.T.F. Enterprises*, *Inc.*,
    889 F.2d 1070 (Fed. Cir. 1989) ...................................................................15

*Octocom Systems, Inc. v. Houston Computer Services*, *Inc.*,
    918 F.2d 937 (Fed. Cir. 1990) ......................................................2, 35, 47, 48

*Packard Press*, *Inc. v. Hewlett-Packard Co.*,
  227 F.3d 1352 (Fed. Cir. 2000) ...............................................47, 48

*Palm Bay Imports*, *Inc. v. Veuve Cliquot*
*Ponsardin Maison Fondee En 1772*,
  396 F.3d 1369 (Fed. Cir. 2005) ........................................31, 54, 55

*Penguin Books Ltd. v. Eberhard*,
  48 U.S.P.Q.2d 1280 (T.T.A.B. 1998)..........................................55

*Promatek Industries*, *Ltd. v. Equitrac Corp.*,
  300 F.3d 808 (7th Cir. 2002) .......................................................45

*Recot*, *Inc. v. Becton*,
  214 F.3d 1322 (Fed. Cir. 2000) ..................................................26

*Research in Motion Ltd. v. Defining Presence Marketing Group, Inc.*,
  102 U.S.P.Q. 2d 1187 (T.T.A.B. 2012).......................................24

*Ritz Hotel*, *Ltd. v. Ritz Closet Seat Corp.*,
  17 U.S.P.Q.2d 1466 (T.T.A.B. 1990)...........................................50

*Sands*, *Taylor & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992) ...............................................16, 26

*Sealed Air Corp. v. Scott Paper Co.*,
  190 U.S.P.Q. 106 (T.T.A.B. 1975)...............................................18

*Secura Committee Consulting*, *Inc. v. Securacom Inc.*,
  984 F. Supp. 286 (D.N.J. 1997), *rev'd on other grounds*,
  166 F.3d 182 (3d Cir. 1999) ........................................................45

*Specialty Brands*, *Inc. v. Coffee Bean Distributing*, *Inc.*,
  748 F.2d 669 (Fed. Cir. 1984) .....................................................20

*Star Industries*, *Inc. v. Bacardi & Co.*,
  412 F.3d 373 (2d Cir. 2005) ........................................................30

*Starbucks U.S. Brands*, *L.L.C. v. Ruben*,
  78 U.S.P.Q.2d 1741 ......................................................................24

*Stork Restaurant v. Sahati*,
    166 F.2d 348 (9th Cir. 1948) ..........................................................................27

*Surf Line Haw., Ltd. v. Ahakuelo*,
    13 U.S.P.Q.2d 1975 (D. Haw. 1989)..........................................................25

*TBC Corp. v. Holsa Inc.*,
    126 F.3d 1470 (Fed. Cir. 1997) ..................................................................15

*Tumblebus Inc. v. Cranmer*,
    399 F.3d 754 (6th Cir. 2005) ........................................................................30

*Tuxedo Monopoly, Inc. v. General Mills Fun Group, Inc.*,
    648 F.2d 1335 (C.C.P.A. 1981)....................................................................14

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992)........................................................................................30

*United States Navy v. v. United States Manufacturing Co.*,
    2 U.S.P.Q.2d 1254 (T.T.A.B. 1987)............................................................37

*Weiss Associates Inc. v. HRL Associates, Inc.*,
    902 F.2d 1546 (Fed. Cir. 1990) ..................................................................44

## STATUTES

15 U.S.C. § 1052(d) ............................................................................................13

15 U.S.C. § 1057(b) ............................................................................................35

## TREATISE

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
(4th ed. 2013) ...............................................................................................*passim*

## STATEMENT OF RELATED CASES

Appellee is aware of no other appeals that have been filed from the

underlying decision of the Trademark Trial and Appeal Board (the "Board") of the

U.S. Patent and Trademark Office ("USPTO") in Opposition No. 91191681.

# JURISDICTIONAL STATEMENT

Appellee Lion Capital L.P. ("Lion Capital") agrees with the Jurisdictional Statement of Appellant Stone Lion Capital Partners L.P. ("Stone Lion Capital") except that it was Appellee Lion Capital – not Stone Lion Capital – that filed Opposition No. 91191681 and claimed it was damaged by registration of the opposed STONE LION CAPITAL mark.

## STATEMENT OF THE ISSUES ON APPEAL

The appeal brought by Stone Lion Capital presents 4 issues for review:

1.      Whether the Board, in following established precedent requiring it to analyze the likelihood of confusion based on the broad identification of services set forth in the opposed application (e.g., "investment advisory services"), erred in its consumer sophistication and conditions of sale analyses when it declined to consider the investors in the parties' actual, current investment funds, the processes and circumstances surrounding investment in said funds and the regulations governing the operation of such funds, where such considerations are not referenced in the opposed application or in the asserted registrations of Lion Capital, where such considerations do not pertain to all of the services identified in the opposed application or asserted registrations, and where the identification of services in the opposed application and asserted registrations are not limited to services associated with the parties' actual, current funds.

2.      If "legion" precedent is set aside,[1] and it is determined that it *was* error for the Board to disregard the foregoing extra-application and extra-registration considerations, whether the lack of confusion at the point of actual investment precludes a finding of likelihood of confusion when the Lanham Act

---

[1] *Octocom Sys.*, *Inc. v. Hous. Computer Servs.*, *Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990) ("The authority is legion" that the determination of registrability may not be based on what the record may reveal about considerations extraneous to the application in issue).

and applicable case law recognize confusion in other contexts, including by way of example, confusion that enables Stone Lion Capital to secure an audience with a potential investor that is actually seeking to meet with Lion Capital, confusion that causes an investor to eschew an opportunity to meet with Lion Capital to learn about its investment offerings or misperception that develops before Lion Capital can even make its own connection with a potential investor, by misinterpretation of press coverage or otherwise.

3.      Whether a reasonable person could conclude that the evidence supports the Board's fact-finding that the LION CAPITAL and LION marks (the "LION CAPITAL Marks") on the one hand and the STONE LION CAPITAL mark on the other hand are similar, and therefore the "similarity of the marks" factor weighs in favor of a likelihood of confusion finding, when the STONE LION CAPITAL mark includes both of the LION CAPITAL Marks in their entireties and when the services in issue are legally identical.

4.      Whether the Board erred in presuming that the relevant consumers (i.e., investors) and channels of trade are identical in view of the legally identical identifications of services in the opposed application and asserted registrations.

# STATEMENT OF THE FACTS

**A.     The LION CAPITAL Marks and Registrations**

Lion Capital is a U.K-based private equity asset management business

whose objective is to maximize returns for its investors by focusing on investment

in companies that are in the consumer products sector.  (A4068-69; A3508.)  Since

2005, Lion Capital has provided all of its investment services under the LION

CAPITAL Marks (A4071-72; A3512-14; A3834-71; A4752-64), which are the

subject of the following U.S. Registrations pled in this case:

> Registration No. 3,543,654 for the mark LION CAPITAL (Registered
> Dec. 9, 2008) in connection with "equity capital investment; venture
> capital services, namely, providing financing to emerging and start-up
> companies; leveraged buy outs and investments in financially
> distressed or underperforming companies; real estate investment;
> hedge fund services."

> Registration No. 3,645,484 for the mark LION (Registered June 30,
> 2009) in connection with "Financial services, namely, financial and
> investment planning and research, financial consultation, and assisting
> others with the completion of financial transactions for stocks, bonds,
> securities and equities; venture capital services, namely, providing
> financing to emerging and start-up companies; leveraged buy outs and
> investments in financially distressed or under performing companies;
> real estate affairs, namely, real estate investment services;
> management of a capital investment fund, capital investment
> consultation and financial trust operations; trust services, namely,
> investment and trust company services, advisory and consultancy
> services relating to corporate finance and venture capital services;
> investment in the field of private equity, venture capital and
> specialized funds and other funds; advising on and managing
> investments; private equity investment management; buying, selling
> and holding of securities; investment management services relating to

acquisitions and mergers; management of equity and debt investment portfolios; investment asset management."

(collectively, the "LION CAPITAL Registrations") (A252, A256-63.)

## B.    Lion Capital's Investment Services Under the LION CAPITAL Marks

Lion Capital's investments take on many forms within the consumer products sector, including in large part equity positions and debt investments in both distressed and successful consumer companies.  (A4069-72; A3508-10.) While Lion Capital is based in the United Kingdom, it has a New York office and has held controlling equity positions in numerous companies with U.S. operations, including by way of some examples Bumble Bee Foods, American Apparel, Jimmy Choo and Kettle Foods.[2]  (A4084; A4155-60; A4199-233.)

Most of the funds used by Lion Capital for its investments are solicited and raised from third party investors, including businesses, pension funds, fund of funds, asset management organizations, family offices and high net-worth individuals.  (A4070-71, A4079; A3508.)  Since its inception, Lion Capital has formed and managed 3 funds into which investor funds are deposited and through

---

[2] Because Lion Capital is so U.S.-focused, in 2007, it formed its subsidiary Lion Capital (Americas), Inc. in New York City (which has since moved operations to Los Angeles, California).  (A4075.)  Contrary to Stone Lion Capital's suggestion (App. Br. at 5-6), as of June 2011, Lion Capital owned investments in eight consumer products companies with a U.S. presence.  (A4084.)

**CONFIDENTIAL MATERIAL OMITTED**

which the company's investments are made – Lion Capital Funds I, II and III.[3]

[███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████]

Because raising investment capital is critical to Lion Capital's business, it is imperative that the LION CAPITAL name is not misassociated with a third party whose reputation is beyond Lion Capital's control. Indeed, crucial to Lion Capital's generation of investor contacts and industry relationships is "word of mouth communication," which makes "eliminating possible confusion between one firm and another… quite a critical matter." (A4088-89.)

Each investor relationship starts with an initial contact either by Lion Capital personnel or a placement agent retained by Lion Capital.[4] (A4082-83.) The number of potential investor contacts made far exceeds the number of actual investors. [████████████████████████████████████████

---

[3] Although Lion Capital Fund I and Lion Capital Fund II closed to new investment in 2007 and 2010 respectively, Lion Capital continues to manage those funds and their holdings. (A3766; A3769.)

[4] Without citation to the record, Stone Lion Capital states that solicitation is unlawful unless there exists "a documented substantive and pre-existing relationship with the potential investor…." (App. Br. at 6-7.) This is a gross overstatement. While there are regulations governing Lion Capital's communications with and disclosures to potential investors, there always is a point of initial contact with a potential investor. (4082-83.)

**CONFIDENTIAL MATERIAL OMITTED**

████████████████████████████████████████████████████

████████████████████████████████████████ ]

    Soliciting investors is one side of Lion Capital's business.  The other side is

seeking, making and managing profitable investments in consumer products

companies.  Thus, Lion Capital must initiate contact with companies that may fit

into Lion Capital's portfolio, frequently by cold calls and/or e-mails from Lion

Capital's investment team to the target company.  (A4184-85; A4187; A4189.)

    The exposure to the LION CAPITAL name extends well beyond the

potential investors and companies contacted by or on behalf of Lion Capital.  Lion

Capital issues press releases in conjunction with each of its company acquisitions

and disposals, which are provided to and frequently picked up by prominent

finance and investment publications distributed in the U.S. including *The Wall*

*Street Journal*, *The New York Times*, *Reuters* in New York and the *Dow Jones*

*Newswire* in the U.S.  (A3707-13; A3872-935.)  Lion Capital's press releases have

also been picked up by *CNN.com*, *FoxBusiness.com* and *Forbes.com*, and many

other Internet business resources.  (A3711-13; A3891-935.)  All such press releases

and third party press coverage prominently feature the LION CAPITAL Marks.

(A3707-13; A3872-935.)

    [████████████████████████████████████████████████

████████████████████████████████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ ]

## C.    Applicant Stone Lion Capital

[█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ .]

(A4793-94; App. Br. at 5.)  But rather than applying to register the STONE LION

CAPITAL mark for these services, on August 20, 2008, Applicant Stone Lion

Capital filed intent-to-use Application Serial No. 77551196 (the "Application") to

register the mark STONE LION CAPITAL in connection with "financial services,

namely, investment advisory services, management of investment funds, and fund

investment services" (the "Application Services").  (*See* A253.)

[█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**CONFIDENTIAL MATERIAL OMITTED**

███████████████████████████████████████████████

████████████████████████████████

　　███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████.]

Stone Lion Capital concedes that in some cases a single individual within one of

these institutions may be responsible for multiple asset classes (i.e., investments),

such as the hedge fund presently offered by Stone Lion Capital and the private

equity fund presently offered by Lion Capital.  (A4482-84.)  Stone Lion Capital

[███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████]

## SUMMARY OF THE ARGUMENT

Stone Lion Capital argues a case that was not before the Board and is not before this Court.  The thrust of its argument is that the due diligence undertaken for and regulatory framework governing investment in the parties' funds would effectively prevent a situation where one invests in the STONE LION CAPITAL fund under the mistaken impression that he or she is actually investing in the LION CAPITAL fund (or vice-versa).  But Stone Lion Capital made this case about far more than its current, high-dollar hedge fund when it elected to file an extremely broad intent-to-use application for the Application Services: "financial services, namely, investment advisory services, management of investment funds and fund investment services."

As the Board correctly found, at issue in this case is *this unrestricted* identification of services, which includes anything from the precise investment advisory services provided by Lion Capital under the LION CAPITAL Marks to the most basic advisory services that may be provided to a novice investor. Indeed, because Stone Lion Capital seeks to register its STONE LION CAPITAL mark for the entire range of investment advisory services, including services that would not be subject to the high-dollar minimums or rigorous review processes entailed by Stone Lion Capital's current hedge fund, Stone Lion Capital's entire exposition concerning the intricacies of its current fund is moot, and the Board was

correct in its conclusion that use of the STONE LION CAPITAL Mark in connection with the Application Services is likely to cause consumer confusion with the LION CAPITAL Marks as used in connection with the services identified in the LION CAPITAL Registrations.

Moreover, even if one were to disregard decades of precedent and read some non-existent qualification or limitation into the Application Services, given the high similarity of the STONE LION CAPITAL mark and the LION CAPITAL Marks (which, contrary to Stone Lion Capital's claim, and as addressed in detail in Section B.2, *infra*, the Board properly found in accordance with well-established law), the direct overlap in the parties' investment advisory services and target investor base, and the lack of third party investor LION-formative marks in use for similar services, confusion is highly likely in a number of contexts prior to the point of actual investment – confusion that is equally damaging to Lion Capital and the investor community, and equally actionable under the Lanham Act.

# ARGUMENT

## A.    STANDARD OF REVIEW

Although Stone Lion Capital is correct that the Board's ultimate likelihood

of confusion finding is reviewed *de novo*, several of its arguments on appeal

concern the Board's fact-findings, including the Board's findings that LION is

arbitrary for investment advisory services (A13; App. Br. at 35), the LION

CAPITAL Marks and the STONE LION CAPITAL mark are similar (A11-14; App.

B. at 32-42), and there is a lack of evidence of third party use of LION-variant

marks in the financial services field (A14-19; App. Br. at 12-13).  *See M2 Software*,

*Inc. v. M2 Commc'ns*, *Inc.*, 450 F.3d 1378, 1381-85 (Fed. Cir. 2006)

(determinations concerning each of the likelihood of confusion factors are fact-

findings); *see also In re Viterra Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012) ("the

question of similarity between two marks and the relatedness of goods are factual

determinations"); *In re Chippendales USA*, *Inc.*, 622 F.3d 1346, 1350 (Fed. Cir.

2010) ("The issue of inherent distinctiveness is a factual determination made by

the board") (citation omitted).  None of these findings may be disturbed provided

that they are supported by "substantial evidence," meaning "such relevant evidence

as a reasonable mind would accept as adequate to support a conclusion."  (App. Br.

at 19) (citations omitted); *see also Citigroup Inc. v. Capital City Bank Grp.*, *Inc.*,

637 F.3d 1344, 1349 (Fed. Cir. 2011) ("We must affirm the T.T.A.B.'s factual

determination unless they are arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence.")

**B.    REGISTRATION OF *STONE LION CAPITAL* IS LIKELY TO CAUSE CONFUSION WITH THE *LION CAPITAL* MARKS**

Section 2(d) of the Lanham Act states in pertinent part that a trademark shall be refused registration if it so resembles a prior used or registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1052(d).  In determining likelihood of confusion, the Board weighs the factors set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973) ("*DuPont*") to the extent those factors are relevant.

Upon reviewing the Application for the STONE LION CAPITAL mark (as opposed to the extra-Application *uses* of the mark that form the basis for the majority of Stone Lion Capital's argument on appeal), the Board concluded, as matters of fact, that (a) the parties' services as identified in their respective Application and registrations, (e.g., Stone Lion Capital's "investment advisory services" and Lion Capital's "advising on and managing investments") are "legally identical" (A9-10), (b) the STONE LION CAPITAL mark and LION CAPITAL Marks are similar (A11-14), (c) given the lack of any trade channel restrictions in the parties' Application and registrations, the parties' trade channels and relevant

consumers are deemed to overlap (A10-11), and (d) while the relevant consumers

(i.e., which given the breadth of the services are any ordinary consumers seeking to

invest money) may be sophisticated and exercise care, such sophistication is

insufficient to dispel confusion given the similarity of the marks and legal identity

of the services in issue (A19-20). As to (i) the strength of the LION CAPITAL

Marks and (ii) the number and nature of similar third party marks, these factors

were deemed neutral. (A14-15.) Weighing these factors, the Board concluded that

confusion is likely.

Stone Lion Capital does not dispute the Board's finding that the services

identified in its Application and the LION CAPITAL Registrations are "legally

identical" (item (a) above),[5] and appeals only the Board's other three findings in

Lion Capital's favor (items (b)-(d) above). Lion Capital addresses each of these in

turn below. (*See* Sections B2-B4, *infra*.) Also, although Stone Lion Capital does

not challenge the Board's finding that the number and nature of similar third party

---

[5] As the Board held, and Stone Lion Capital has not disputed, Stone Lion Capital's broad identification of the Application Services necessarily encompasses the very financial and investment services for which Lion Capital owns U.S. Registrations, and in connection with which it uses the LION CAPITAL Marks. (A9-10); *L'Oreal S.A. v. Marcon*, 102 U.S.P.Q.2d 1434, 1441 (T.T.A.B. 2012) (it is presumed that Applicant's services identification encompasses all services of the type described). As such, the Board properly held that this *DuPont* factor "weighs strongly in favor of a likelihood of confusion." (A9-10) (citing *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp., Inc.*, 648 F.2d 1335 (C.C.P.A. 1981)).

marks factor is neutral, it misrepresents the record evidence with respect to alleged third-party marks. This too is addressed below. (*See* Section C, *infra.*)

**1.      Principles Governing Weighing of the Likelihood of Confusion Factors**

The *DuPont* factors must be applied in accordance with two guiding principles. *First*, all doubts about whether confusion is likely must be resolved in favor of Lion Capital, the acknowledged prior user. *See Nina Ricci*, *S.A.R.L. v. E.T.F. Enters.*, *Inc.*, 889 F.2d 1070, 1074 (Fed. Cir. 1989). *Second*, as the newcomer, Stone Lion Capital had an obligation to avoid selecting a mark that even comes close to the LION CAPITAL Marks in order to protect Lion Capital's goodwill in its prior-used marks and protect consumers from confusion. *Bridgestone Americas Tire Operations*, *L.L.C. v. Fed. Corp*., 673 F.3d 1330, 1333 (Fed. Cir. 2012) ("a new entrant presenting a new mark for registration has an obligation to avoid confusion with established marks in the same market."); *TBC Corp. v. Holsa Inc.*, 126 F.3d 1470, 1472 (Fed. Cir. 1997).

Stone Lion Capital also asserts that "if a mark is not well-known, it is more difficult for a trademark owner so show likelihood of confusion." (App. Br. at 39) (*citing Kenner Parker Toys Inc. v. Rose Art Indus.*, *Inc.*, 963 F.2d 350, 352-53 (Fed. Cir. 1992)). While the Court in *Kenner* said nothing regarding the "difficulty" of showing a likelihood of confusion, it did set forth the well-established principal that, when assessing the similarity of the marks and relatedness of services,

stronger marks are afforded broader scope of protection than weaker marks (i.e., confusion with strong marks may be likely even when marks are dissimilar marks or in the case of unrelated services). (*Id*.) As set forth below, the Board held that the LION CAPITAL Marks are arbitrary and conceptually strong and so, this principal would only further support the Board's holding. (*See* Section B.2.c.*ii*, *infra*.) But moreover, this principal is irrelevant, and the strength of a plaintiff's mark is of little importance, where, as here, the marks in issue are similar and the services in issue are identical. *See Sands*, *Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947, 958-59 (7th Cir. 1992); *GoTo.com*, *Inc. v. Walt Disney Co*., 202 F.3d 1199, 1208 (9th Cir. 2000) (when conflicting marks and respective goods are almost identical, the strength of the plaintiff's mark is of diminished importance; *see also Hunt Control Sys. Inc. v. Koninklijke Philips Elecs. N.V*., 98 U.S.P.Q.2d 1558, 1567-68 (T.T.A.B. 2011) (while opposer's SIMPLICITY mark was suggestive and likely weak, there was a likelihood of confusion with applicant's SENSE AND SIMPLICITY for directly competitive goods).

**2.     The Board Correctly Held That The STONE LION CAPITAL Mark Is Similar To The LION CAPITAL Marks**

The Board held that LION is the dominant term in each of the parties' marks, and that addition of the term STONE to Lion Capital's precise LION CAPITAL mark is "not sufficient to distinguish the marks in the context of the parties' services…." (A14.) As such, the Board found that the marks are "similar

in sight, sound, meaning and overall commercial impression." (*Id.*)  This Court

should defer to such fact-finding, which is supported by the evidence.  *See Viterra*,

671 F.3d at 1361 ("the question of similarity between two marks and the

relatedness of goods are factual determination").

     a.    <u>Legal Principles Relevant to the Similarity of the Marks Analysis</u>

     Because it is undisputed that Stone Lion Capital seeks to register the

STONE LION CAPITAL mark in connection with services *identical* to those

provided by Lion Capital under its LION CAPITAL Marks and for which Lion

Capital owns federal registrations (A9-10), the Board recognized that "the degree

of similarity to find likelihood of confusion need not be as great as where there is a

recognizable disparity between the services."  (A13); *see also In re Mighty Leaf

Tea*, 601 F.3d 1342, 1348 (Fed. Cir. 2010) (less similarity needed when marks are

used in connection with virtually identical goods or services; finding ML for

personal care products and ML MARK LEES for skin care products confusingly

similar); *Bridgestone*, 673 F.3d at 1337 ("[w]hen the goods are identical, the

appearance of a mark of similar sound, appearance, or connotation is more likely to

cause confusion than if the goods are significantly different"; finding confusion

between Bridgestone's POTENZA and TORANZA marks on the one hand and

Federal's MILANZA mark on the other hand); *Century 21 Real Estate Corp. v.

Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992); *see also Centraz Indus.*,

*Inc. v. Spartan Chem. Co.*, 77 U.S.P.Q.2d 1698, 1700-01 (T.T.A.B. 2006) (ICE

SHINE and ISHINE deemed "remarkably similar . . . especially [since] identical

products are involved.").

The "similarity of the marks" factor focuses on the similarity of the marks in

their entireties as to appearance, sound, connotation and commercial impression.

*DuPont*, 476 F.2d at 1361.  In determining whether the marks are sufficiently

similar to give rise to a likelihood of confusion, the Lanham Act does not require

that marks be identical.  *See Bridgestone*, 673 F.3d at 1337.  Rather, the test is

whether the marks are sufficiently similar in their entireties such that confusion is

likely to result.  *See Joel Gott Wines L.L.C. v. Rehoboth Von Gott Inc.*, 107

U.S.P.Q.2d 1424, 1430 (T.T.A.B. 2013).  As the Board has repeatedly noted, "the

focus is on the recollection of the average purchaser, who normally retains a

general rather than a specific impression of trademarks."  *Id.* (*citing Sealed Air

Corp. v. Scott Paper Co.*, 190 U.S.P.Q. 106, 108 (T.T.A.B. 1975)).  In other words,

the Board should not be examining the marks "with a microscope to find the

differences, for this is not the way the average purchaser views the marks.  To the

average buyer, the points of similarity are more important than numerous points of

difference."  4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair

Competition* (hereinafter *"McCarthy"*), § 23:41 at 23-227 (4th ed. 2013).

These principles are particularly applicable in this case because, as Stone Lion Capital concedes, the parties' marks are typically encountered by investors and other investment industry participants in news articles, fund reports or by word of mouth.  (App. Br. at 38; A4088-89; A3707-13; A3872-935.)  Such transient communications render precise recollection of the names less likely, and must be taken into account.  *See McGregor-Doniger*, *Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 (2d Cir. 1979) (the court must consider "all the factors that could reasonably be expected to be perceived by and remembered by potential purchasers."); *cf. In re Research & Trading Corp.*, 793 F.2d 1276, 1279 (Fed. Cir. 1986) ("[h]uman memories even of discriminating purchasers… are not infallible.")(citation omitted).

In view of the foregoing facts and principles, and considering that the STONE LION CAPITAL mark incorporates both of the LION CAPITAL Marks in their entireties, the Board properly held that the marks are similar and that this factor supports its ultimate conclusion that confusion is likely.  Unless this Court concludes that no reasonable mind could find the marks to be similar on the evidence, this Court may not disturb the Board's fact finding.  *Viterra Inc.*, 671 F.3d at 1361 ("[w]here two different conclusions may be warranted based on the evidence of record, the Board's decision to favor one conclusion over the other is

the type of decision that must be sustained by this court as supported by substantial

evidence.") (quotation omitted).

      b.    <u>The Board Properly Compared The Marks In Their Entireties</u>

Stone Lion Capital acknowledges that both parties' marks contain the

disclaimed term CAPITAL and that the Board must not dissect marks when

comparing the marks but rather must compare the marks in their entireties.  (App.

Br. at 32-33.)  Yet, it maintains that the Board's "reasoning that the STONE LION

CAPITAL mark 'incorporates the entirety of [LION CAPITAL's] marks" was

improper because such reasoning accords the term CAPITAL "meaningful

weight."[6]  (*Id*. at 34.)  Ironically, this very argument suggests Stone Lion Capital's

wanted the Board to disregard CAPITAL in its analysis, which would amount to

the very dissection Stone Lion Capital and the law condemn.  *See Specialty*

*Brands*, *Inc. v. Coffee Bean Distribs.*, *Inc.*, 748 F.2d 669, 673 (Fed. Cir. 1984)

("Arguments to the effect that one portion of a mark possesses no trademark

significance leading to a direct comparison between only what remains is an

erroneous approach") (citation omitted).

Moreover, the Board's reasoning that the STONE LION CAPITAL mark

"incorporates the entirety of [Lion Capital's] marks" was sound and is well-

---

[6] Contrary to Stone Lion Capital's claim, clearly the Board accorded the term
CAPITAL less weight than the other components of the marks.  It stated expressly
that the term CAPITAL is disclaimed and descriptive in the parties' marks and
therefore has "less significance" in the similarity analysis.  (A13.)

supported.  (A13.)  Indeed, it is well established that "[i]f a junior user takes the entire arbitrary mark of another, addition of a suggestive or descriptive element is generally not sufficient to avoid confusion."  4 *McCarthy* § 23:50 at 23-265 (*citing*, *inter alia*, *Miss Universe L.P. v. Comty. Mktg.*, *Inc.*, 82 U.S.P.Q.2d 1562, 1570 (T.T.A.B. 2007) (finding likelihood of confusion between MISS UNIVERSE mark and challenged MR. GAY UNIVERSE)); *see also Hunt Control Sys.*, 98 U.S.P.Q.2d at 1566 (SENSE AND SIMPLICITY confusingly similar to SIMPLICITY; adding the suggestive term SENSE insufficient to distinguish the marks); *In re Toshiba Med. Sys. Corp.*, 91 U.S.P.Q.2d 1266, 1269 (T.T.A.B. 2009) (finding likelihood of confusion between TITAN and VANTAGE TITAN, both for medical diagnostic equipment); *Hard Rock Café Int'l (USA)*, *Inc. v. Elsea*, 56 U.S.P.Q.2d 1504 (T.T.A.B. 2000) (finding likelihood of confusion between HARD ROCK CAFÉ and COUNTRY ROCK CAFE, both for restaurant services); *Henry Siegel Co. v. M & R Int'l Mfg. Co.*, 4 U.S.P.Q.2d 1154 (T.T.A.B. 1987) (finding likelihood of confusion between CHIC and L.A. CHIC, both for women's clothing); *In re Rexel Inc.*, 223 U.S.P.Q. 830 (T.T.A.B. 1984) (finding likelihood of confusion between GOLIATH mark for pencils and challenged LITTLE GOLIATH mark for staplers).  As in all of the above-cited cases, the Board recognized that Stone Lion Capital's addition of the adjective STONE to Lion Capital's precise LION CAPITAL mark, while contributing to the overall

commercial impression of the STONE LION CAPITAL mark, is insufficient to render the marks dissimilar.  (A13-14.)

Notwithstanding the foregoing precedent, Stone Lion Capital insists that the Board did not accord sufficient weight to the term STONE in its analysis, and that the Board erred in finding that LION (as opposed to STONE LION) is the dominant element of its mark.  (App. Br. at 37; A13-14.)  But this position is belied by Stone Lion Capital's own argument that its mark connotes "patience, courage, fortitude and strength," all characteristics typically attributed to a lion.  (App. Br. at 38.)  Indeed, LION is the term members of the investment community will most likely remember with respect to either party's marks, particularly considering how the marks are typically encountered in the investment community and the imperfections of memory.  Clearly, the term LION is the root element in the parties' marks, and as such, is the dominant element.  *See Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1378 (Fed. Cir. 2002) (finding the term WAVE to be the dominant, "root element" in opposer's marks WAVE and ACOUSTIC WAVE and applicant's mark POWERWAVE; reversing Board's finding that confusion unlikely).  At the very least, it cannot be said that such a fact determination is unsupported by the evidence such that this Court may disregard the Board's finding.

Stone Lion Capital takes specific issue with the Board's observation that the term STONE is an "adjective modifying the noun 'LION.'"  (App. Br. at 37.)  But Stone Lion Capital points to no rule precluding the Board from taking into account the grammatical structure of the parties' marks in assessing dominance.  In fact, the Board commonly finds that the addition of an adjective – even a distinctive adjective – to a plaintiff's mark (a noun) is insufficient to avoid a likelihood of confusion.  *See*, *e.g.*, *Miss Universe*, 82 U.S.P.Q.2d at 1570 (finding likelihood of confusion between MISS UNIVERSE mark and challenged MR. GAY UNIVERSE); *Toshiba Med. Sys.*, 91 U.S.P.Q.2d at 1269 (noting that even addition of a distinctive term does not necessarily render marks dissimilar and finding likelihood of confusion between TITAN and VANTAGE TITAN); *Rexel*, 223 U.S.P.Q. (finding likelihood of confusion between GOLIATH mark for pencils and challenged LITTLE GOLIATH mark for staplers).

Further supporting the Board's finding that LION is the dominant element is that the term STONE merely modifies and does not alter the meaning or significance of the term LION – in both parties' marks, the term LION has the same meaning (i.e., to denote the characteristics of the breed of animal known as a lion).  Stone Lion Capital disputes this and offers the analogy of the phrase "black hole," to show how an adjective can have a transformative effect on a noun, but the comparison serves to show only that the adjective "stone" *does not* have such a

transformative effect on the noun "lion."  (App. Br. at 37.)  Indeed, whereas the term "hole" ordinarily refers to an aperture of some sort, a "black hole" *is not a hole at all*, but rather the phrase has independent meaning referring to an infinitely dense, highly gravitational region of space-time.  In contrast, the phrase "stone lion" has no independent meaning, and the term "lion" retains the same meaning in "stone lion" that it has standing alone.[7]

Finally, Stone Lion Capital argues that consumers are often apt to remember the first portion of its mark.  (App. Br. at 38.)  However, it is well established that "it is impossible to make any generalized statement as to whether the beginning or end of a mark is more important when one or the other is used by another seller." 4 *McCarthy* § 3:45 at 23-243; *see also Research in Motion Ltd. v. Defining Presence Mktg. Grp., Inc.*, 102 U.S.P.Q.2d 1187 (T.T.A.B. 2012) (likelihood of confusion between CRACKBERRY for online services and BLACKBERRY for smart phones); *Starbucks U.S. Brands, L.L.C. v. Ruben*, 78 U.S.P.Q.2d 1741 (T.T.A.B. 2006 (likelihood of confusion between STARBUCKS and LESSBUCKS); *Mont.*

---

[7] Stone Lion Capital argues that LION connotes a living creature, whereas STONE LION connotes a statue.  But this is a false comparison.  The term "lion" connotes all of the qualities and characteristics of a lion, but not necessarily a living lion.  To illustrate, if one is asked to identify what is depicted in a picture or drawing of a lion, the most likely response would be "a lion."  Likewise, if one is asked to identify what is depicted by a statue of a lion made out of stone, the likely response would still be "a lion" (not "a stone lion").  As such, the term "stone" is just a modifier (i.e., an adjective) of the term "lion," and has does not have the transformative effect that Stone Lion Capital suggests.

*Prof'l Sports*, *L.L.C. v. Leisure Sports Mgmt.*, *Inc.*, 422 F. Supp. 2d 1271 (M.D. Fla. 2006) (likelihood of confusion between BILLINGS OUTLAWS and OSCEOLA OUTLAWS); *Surf Line Haw.*, *Ltd. v. Ahakuelo*, 13 U.S.P.Q.2d 1975 (D. Haw. 1989) ( likelihood of confusion between JAMS and HAWAIIAN JAMS).

   c.    <u>The Board Did Not Give Excessive Weight To The Similarity of the Marks Factor</u>

Stone Lion Capital's argument that the Board accorded excessive weight to the similarity of the marks factor is premised primarily on its erroneous statement that the Board concluded that the LION CAPITAL Marks are weak, an error Stone Lion Capital repeats throughout its brief.  (App. Br. at 12, 18, 36, 39.)  To be clear, the Board never found that the LION CAPITAL Marks are weak; it found that the strength of the marks factor was *neutral*, despite finding that LION is arbitrary as applied to investment services and therefore conceptually strong.  (A13.)  In any event, Stone Lion Capital offers no legal authority for its proposition that the similarity of the marks analysis takes on lesser importance in the overall likelihood of confusion analysis and therefore should be accorded less weight even when dealing with an allegedly weak mark.

Stone Lion Capital also contends, without citing any legal basis, that the Board's finding that the marks are similar should have carried less weight given Lion Capital's statement to the USPTO more than 5 years ago that ROARING LION is unlikely to be confused with LION CAPITAL.  As expressly set forth in

its opinion, the Board gave this statement the very consideration that the law requires, and recognized that Lion Capital's statement, which was made at a different time under different circumstances with respect to a different mark, has minimal relevance here.

### i. *Stone Lion Capital's Legal Argument Is Unsupported By Law*

Putting aside for a moment whether the LION CAPITAL Marks are strong, weak or somewhere in between, Stone Lion Capital's legal argument is misplaced. It argues that a mark's fame "is supposed to play a 'dominant role in the process of balancing the *DuPont* factors," ((App. Br. at 39) *citing Recot*, *Inc. v. Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000)), and that confusion is "more difficult" to show with respect to a weak mark.  (*Id*.)

Stone Lion Capital selectively quotes the *Recot* case, which actually says that fame plays a "dominant role" only "when present" (i.e., when the mark is actually deemed famous).  *Recot*, 214 F.3d at 1327.  And it ignores the converse principal that is actually applicable here, namely that the strength of a plaintiff's mark is of little importance, where, as here, the marks are similar and the goods are closely related.  *See Sands*, *Taylor & Wood Co*, 978 F.2d at 958-59; *GoTo.com*, 202 F.3d at 1208; *Hunt Control Sys*., 98 U.S.P.Q.2d at 1567-68.

To the extent Stone Lion Capital is just arguing that lesser known marks are afforded a lesser scope of protection than stronger marks, Lion Capital does not

dispute this. However, given the conceptual strength of the LION CAPITAL Marks (*see* Section B.2.c.*ii*, *infra*), the legal identity of services in issue, and the fact that the STONE LION CAPITAL mark incorporates the LION CAPITAL Marks in their entireties,[8] under the reasoning of the above-cited cases, the STONE LION CAPITAL Application comes well within the scope of protection afforded to the LION CAPITAL Marks, regardless of the breadth of that protection.

   ii.    *The Board Did Not Find The LION CAPITAL Marks Weak – In Fact The Marks Are At Least Conceptually Strong*

The Board found that the LION mark is "arbitrary," and thus conceptually *strong*, as applied to investment advisory services.[9] (A13); *Morningside Grp. Ltd. v. Morningside Capital Grp.*, *L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999) ("When a mark has been deemed arbitrary, as opposed to generic, descriptive or suggestive, its very arbitrariness is an indicum of strength."); *Am. Lebanese Syrian Associated*

---

[8] Also, while Lion Capital maintains that its marks are extremely well-known and commercially strong in the investment industry, given the publicity of the marks in all of the go-to finance industry publications, and the thousands of investors that have been approached by Lion Capital (A3707-13; A3872-935; A4083), the evidence does support a finding that the LION CAPITAL Marks are at least reasonably well-known in the investment community (i.e., they have *some* commercial strength).

[9] While the Board did not address directly the conceptual strength of the LION CAPITAL mark (as distinguished from the LION mark), the mere addition of the term CAPITAL, which is disclaimed in Registration No. 3,543,654 for the LION CAPITAL mark, does not render the LION CAPITAL mark any less arbitrary than LION. *See e.g.*, *Stork Rest. v. Sahati*, 166 F.2d 348 (9th Cir. 1948) (STORK CLUB is arbitrary for night club services).

*Charities*, *Inc. v. Child Health Research Inst.*, 101 U.S.P.Q.2d 1022, 1028

(T.T.A.B. 2011) (acknowledging distinction between conceptual / inherent strength

and commercial / marketplace strength).  This finding is consistent the Board's

prior holding in another case involving Lion Capital's LION mark, namely that it

"fail[ed] to see any descriptive or suggestive meaning of the word 'Lion' in

connection with investment management and financial advisory services." *In re*

*Lion Global Investors Ltd.*, App. Ser. No. 79063620, Order of May 9, 2012, at *11

(T.T.A.B. May 9, 2012) (TTABVUE #19) (non-precedential) (affirming the

USPTO's rejection of an application to register LION GLOBAL INVESTORS

based on Lion Capital's Registration No. 3,645,484 for the LION mark.)  This

finding by the Board is not to be disturbed provided it is supported by the

evidence.  *In re Pacer Tech*., 338 F.3d 1348, 1349 (Fed. Cir. 2003) (whether a mark

is arbitrary is a factual determination made by the Board).

The basis for the Board's finding that the strength of the marks factor is

neutral was its conclusion that Lion Capital "ha[d] not established that its marks

are well-known in the financial services field."  (A14.)  In other words, despite

Lion Capital's evidence that, *inter alia*, its LION CAPITAL funds are valued in the

billions of dollars and the LION CAPITAL Marks have been publicized repeatedly

in the go-to finance industry publications (even Stone Lion Capital's principal

concedes having read about Lion Capital in the *Wall Street Journal* (A4494-95)),

the Board held that the evidence did not support a finding that the marks are *commercially* strong.  Presumably balancing this finding with its finding that the marks are arbitrary and conceptually strong, as it was required to do, *American Lebanese Syrian Associated Charities*, *Inc. v. Child Health Research Institute*, 101 U.S.P.Q.2d 1022, 1028 (T.T.A.B. 2011) (the Board must consider both inherent strength and commercial strength when assessing the strength of opposer's mark), the Board resolved that the strength of the marks factor is *neutral*.

Stone Lion Capital disputes the Board's fact-finding that the LION CAPITAL Marks are arbitrary and therefore conceptually strong, citing Lion Capital's testimony that it selected the name because the term LION is associated with prowess, strength and leadership, which Stone Lion Capital argues is a concession that LION is a laudatory, suggestive and weak mark . (App. Br. at 35.) While admittedly the name was selected because the term LION refers to an animal with strong qualities, this does not render the mark suggestive, or for that matter weak, as applied to investment advisory services.  Indeed, the term itself suggests nothing about Lion Capital's investment advisory services, and no amount of imagination could lead one to conclude that LION is a reference to investment advisory services.  *See In re Nett Designs*, *Inc.*, 236 F.3d 1339, 1341 (Fed. Cir. 2001) (a mark is suggestive if one can glean the nature of the goods or services through imagination, thought or perception); *see also Lion Global Investors*, App.

Ser. No. 79063620, Order of May 9, 2012, at *11 (concluding that it "fail[s] to see any descriptive or suggestive meaning of the word 'Lion' in connection with investment management and financial advisory services.")

Further, even if the LION mark does have some suggestive qualities, they are faint at best, and in any event a suggestive mark "is entitled to the same protection accorded arbitrary and fanciful marks."  2 *McCarthy* § 11:62 at 11-175; *see also Two Pesos*, *Inc. v. Taco Cabana*, *Inc.*, 505 U.S. 763, 768 (1992) (noting that suggestive, arbitrary and fanciful marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive").[10]

Finally, the Board held that (i) "the number of LION-formative marks with evidence relating to their actual use in association with similar services is small," (ii) it "cannot conclude that the record contains sufficient probative evidence of third-party use to establish a crowded field of LION-formative marks for similar investment services" and (iii) "Applicant has not established that the investment services field is crowded with LION-formative marks, such that consumers for

---

[10] Stone Lion Capital's sweeping assumption that all suggestive marks are presumptively weak and subject to a narrow scope of protection (App. Br. at 35-36) is incorrect and contrary to the law. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 764 (6th Cir. 2005) (the "TUMBLEBUS mark's relative strength as a suggestive mark" weighs in favor of a likelihood of confusion); *Star Indus.*, *Inc. v. Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005) (even without any showing of commercial strength, suggestive marks can be "moderately strong"); *Del Labs.*, *Inc. v. Alleghany Pharmacal Corp.*, 516 F. Supp. 777, 780 (S.D.N.Y. 1981) ("a mark which is either suggestive or arbitrary is strong and presumptively valid.")

legally identical services are accustomed to distinguishing among them based on relatively small differences in the marks." (A18-19.) As such, Lion Capital's relatively exclusive use of the distinctive LION CAPITAL Marks lends further support to a finding that they are strong. *See Palm Bay Imps.*, *Inc. v. Veuve Cliquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) (recognizing that the number and nature of third party marks factor is relevant to the strength of the mark); *Frehling Enters.*, *Inc. v. Int'l Select Grp.*, *Inc.*, 192 F.3d 1330, 1336 (11th Cir. 1999) ("The case law is clear that such lack of third-party use should considered in assessing the strength of a mark… Where there is a lack of third-party use, the mark's strength is enhanced, as it is more distinctive, and therefore more easily recognized by consumers.") (See further discussion at Section C, *infra*.)

In sum, given the legal identity of the services and the similarity of the parties' marks, the strength of the LION CAPITAL Marks is of minor import to the likelihood of confusion analysis. Moreover, given the conceptual strength of the LION CAPITAL Marks, the (at least) cognizable commercial strength of the marks in the investment community and the lack of evidence of third party use, the marks are at least strong enough that the STONE LION CAPITAL Application for legally identical services, despite the addition of the adjective STONE, comes within the scope of protection afforded to the LION CAPITAL Marks.

*iii.*    *Lion Capital's Statements to the USPTO 5 Years Ago Are Of Minimal Relevance.*

Stone Lion Capital argues that Lion Capital's statements to the USPTO more than 5 years ago (concerning the mark ROARING LION) in connection with its application to register the LION CAPITAL mark likewise discount the importance of the similarity of the marks analysis.  (App. Br. at 41.)  But again, Stone Lion Capital sites no law for this proposition.  In fact, it is well-established that when a party argues that cited marks are not confusingly similar in order to overcome a Section 2(d) refusal in an Office Action, that is a legal argument and does not alter the Board's burden of reaching its own conclusion on the record before it. *Interstate Brands Corp. v. Celestial Seasonings*, *Inc*., 576 F.2d 926, 929 (C.C.P.A. 1978).  As the Board recognized, such argument may only be considered to be "illuminative of shade and tone in the total picture confronting the decision maker," which pursuant to the Board's express statement, is precisely how it treated Lion Capital's earlier statements to the USPTO. (A18; *citing id.* and *Anthony's Pizza & Pasta Int'l, Inc. v. Anthony's Pizza Holding Co.*, 95 U.S.P.Q.2d 1271, 1281 (T.T.A.B. 2009), *aff'd*, 415 F. App'x. 222 (Fed. Cir. 2010)).

Moreover, Lion Capital's statement was made 5 years ago and concerned a completely different mark for a more narrow identification of services than the Application Services.  And as the Board also noted, the mark ROARING LION, which does not include the term CAPITAL, makes an overall commercial

impression less similar to the LION CAPITAL Marks than does the STONE LION

CAPITAL mark. (A18.)  Thus, any statement made five years ago regarding

whether consumer confusion is likely as between the ROARING LION registration

and the LION CAPITAL application is of scant relevance to the question presented

here.

*       *       *

Given the identity of the parties' services in issue and that the STONE LION

CAPITAL mark incorporates the LION CAPITAL Marks in their entireties, the

Board's conclusion that the similarity of the marks factor weighs in Lion Capital's

favor is amply supported by the evidence.  Thus, this Court must affirm the

Board's fact-finding with respect to the similarity of the marks.

**3.     The Board Properly Assessed Consumer Sophistication and Conditions of Sale**

Stone Lion Capital spends the vast majority of its brief arguing that the

Board erred in failing to take into account information that is outside the scope of

Stone Lion Capital's Application and therefore outside the scope of the Board's

review, namely, alleged investor sophistication and the conditions of sale in

connection with a mere subset of the Application Services.  But Stone Lion

Capital's arguments are irrelevant, and miss the point of this opposition proceeding

in two important respects:  *First*, the argument ignores Applicant's broad

description of the Application Services, which include "investment advisory

services" generally, and not merely those services that would be subject to the

investor sophistication and due diligence practices relied on by Stone Lion Capital.

(A19.) *Second*, even if the Board had mistakenly taken such matters into account,

they do not serve to lessen the likelihood that harmful and actionable confusion

will occur.

### a. Stone Lion Capital's Conditions of Sale / Consumer Sophistication Argument Ignores Their Broad Identification of Services

At its own peril, Stone Lion Capital applied to register the STONE LION

CAPITAL mark for the entire spectrum of investment advisory services.

Trademark scholar J. Thomas McCarthy warns against such overbroad

applications, and the eventual repercussions in opposition proceedings:

> The specification of goods is important since a registration is prima facie evidence that the registrant is using the registered mark on the goods or services specified in the registration. The description of goods must not be too vague… The specification must be accurate, for if the application is opposed, the controlling factor is the description of goods in the application.

3 *McCarthy* § 19:48 at 19-147 - 19-148.

Here, while Stone Lion Capital's intent-to-use Application could be read to

cover the advisory services that it presently provides in connection with its high-

dollar hedge fund, it is not limited to any such regulated financial services.

Instead, it has filed broadly for "financial services, namely, investment advisory

services, management of investment funds, and fund investment services." As the

Board correctly noted, and as Stone Lion Capital seems to concede, none of these services are "restricted to high-dollar investments or sophisticated consumers" and the Application Services "could be offered to, and consumed by, anyone with money to invest, including ordinary consumers seeking investment services." (A19.) Indeed, by law the Application Services must be construed to include even the most rudimentary investments that can be made by an inexperienced investor (e.g., a 401k investment), as the registration that Stone Lion Capital seeks would constitute *prima facie* evidence of its rights in the STONE LION CAPITAL mark for *any and all* investment advisory services. 15 U.S.C. § 1057(b); *Octocom Sys.*, 918 F.2d at 942 ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods are directed."); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 950-51 (Fed. Cir. 2000) (refusing to consider distinctions between the parties actual products as sold in the marketplace and considering only the goods as described in the registration); *L'Oreal*, 102 U.S.P.Q.2d at 1441 ("it is presumed that the identifications encompass all goods of the type described").

Stone Lion Capital's response is to simply ignore the breadth of its own Application and the established law, focusing instead on its use of the STONE

LION CAPITAL mark in connection with its current high-dollar hedge fund.  But

Stone Lion Capital chose not to apply to register its mark for these specific

investment advisory services.  Having made the decision to file broadly, it must

now accept the consequences of that decision.  Nothing in the Application Services

limits them to the investors of Stone Lion Capital's hedge fund.  Anyone with a

401k, a pension, money to invest for a child's education is a potential consumer for

"investment advisory services," and the Board was required to base its decision on

the *least* sophisticated potential consumers.  *Gen. Mills Inc. v. Fage Dairy*

*Processing Indus. S.A.*, 100 U.S.P.Q.2d 1584, 1600 (T.T.A.B. 2011); *Alfacell*

*Corp. v. Anticancer*, *Inc.*, 71 U.S.P.Q.2d 1301, 1306 (T.T.A.B. 2004).

To paraphrase from Stone Lion Capital's own brief, nothing in the law

permits Stone Lion Capital or the Board to blink away the services identified in the

Application in favor of the more restricted services that Stone Lion Capital is

presently offering.  Thus, in accord with well-established precedent, the Board

properly disregarded Stone Lion Capital's arguments concerning the actual

conditions of investment that are particular to its high-dollar hedge fund.  *See H.D.*

*Lee Co. v. Maidenform*, *Inc.*, 87 U.S.P.Q.2d 1715, 1726 (T.T.A.B. 2008) (rejecting

consumer sophistication argument because the parties' application and registration

in issue contain no limitations and thus include inexpensive products bought by

ordinary consumers); *In re Opus One*, *Inc.*, 60 U.S.P.Q.2d 1812, 1817 (T.T.A.B.

2001) (Board must disregard argument regarding high cost of applicant's restaurant services and sophistication of its clientele when application was for restaurant services generally); *U.S. Navy v. v. U. S. Mfg. Co.*, 2 U.S.P.Q.2d 1254, 1259 (T.T.A.B. 1987) ("even though applicant's actual [professional orthotics] goods move only through restricted channels of trade to sophisticated purchasers [professional fitters who work from doctors' prescriptions], we must decide the case based on the broad language used in the application, which included all orthotic devices such as elastic braces for tennis elbows and similar stretch bandage-type braces for knees, ankles and so forth.")

Stone Lion Capital relies on *Electronic Design and Sales*, *Inc. v. Electronic Data Systems Corp.*, 954 F.2d 713, 717 (Fed. Cir. 1992), reading it to contravene all of the foregoing case law and to require the Board to take into account the sophistication of the parties' *actual* investors and the conditions surrounding their *current* investments irrespective of the broad identification of Application Services. (App. Br. at 42-43.) But *Electronic Design* does not say this. Rather, it expressly confirms that the consumer sophistication analysis must be made based solely on the "record description" (i.e., as they are identified in the parties' filings) of the goods and services in issue. 954 F.2d at 718. And in that case, as Stone Lion Capital points out, "purchaser sophistication and care [could] readily be inferred simply from the identification of goods or services…." (App. Br. at 25.)

Indeed, the Court in *Electronic Design* stated that "[j]ust from the record description of goods and services one would expect that nearly all of opposer's and applicant's purchasers would be highly sophisticated." *Elec. Design*, 954 F.2d at 718.[11]

Here, the Board likewise evaluated consumer sophistication *based on the record descriptions of services*, not the extraneous considerations relied on by Stone Lion Capital. Moreover, contrary to Stone Lion Capital's suggestion, the Board did not ignore consumer sophistication; it specifically acknowledged that "even ordinary consumers will exercise care when making financial decisions." (A19.) However, the Board ultimately concluded that even "careful or sophisticated purchasers are not immune from source confusion where similar marks are used in connection with related services," which is consistent with well-established case law on point. (*Id.*) (citing *Research & Trading Corp.*, 793 F.2d at 1279 ("That the relevant class of buyers may exercise care does not necessarily

---

[11] Further illustrating this point are the two other cases cited by Stone Lion Capital where it was readily apparent from the face of the filings in those cases that the goods and services in issue were provided only to sophisticated consumers. *In re Digirad Corp*, 45 U.S.P.Q.2d 1841, 1842 (T.T.A.B. 1998) (involving an application for "solid state gamma radiation sensors, signal processors and display apparatus for use in medical isotopic tracing and medical nuclear imaging," and a registration for, *inter alia*, "electronic digital x-ray system comprised of an x-ray scanning beam tube and detector for medical use"; *Dynamics Research Corp. v. Langenau Mfg. Co.*, 704 F.2d 1575, 1576 (Fed. Cir. 1983) (describing products in issue as "encoders and numerically controlled back gauges for press brakes" on the one hand, and a "sheet metal fabric" created by a "process called 'double reverse corrugation'" on the other hand).

impose on that class the responsibility of distinguishing between similar trademarks for similar goods."); *see also Morningside Grp.*, 182 F.3d at 143 ("[i]t is clear in all events that when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion.") (citation and internal quotation marks omitted); *AutoZone Parts*, *Inc. v. Dent Zone Cos.*, 100 U.S.P.Q.2d 1356, 1364 (T.T.A.B. 2011) (citing *In re Research & Trading Corp.* for same proposition).

The crucial difference between this case and *Electronic Design* is that the services in issue here are identical, whereas in *Electronic Design* the services of the opposer differed considerably from the goods of the applicant. *Elec. Design*, 954 F.2d at 718 (comparing computer programming services and industrial power supplies and battery chargers). Because of this, the Board in this case ultimately concluded that the care and diligence extended by ordinary consumers in connection with investment transactions would be insufficient to prevent confusion given the similar marks and identical services in issue. (A19.); *Research & Trading Corp.*, 793 F.2d at 1279 (sophistication of consumers of industrial buckles and safety harnesses insufficient to prevent confusion in the case of "similar trademarks for similar goods."); *Morningside Grp.*, 182 F.3d at 143 (finding investor sophistication insufficient to prevent confusion where there is a high degree of similarity between the parties' services and marks).

CONFIDENTIAL MATERIAL OMITTED

Finally, the Board had even further cause to disregard the circumstances of investment in Stone Lion Capital's current hedge fund in the fact that the Application is an intent-to-use application filed pursuant to Section 1(b). Stone

[███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ ]

such additional offerings, there is no reason to assume the restrictions applicable to its current hedge fund offering would apply to such prospective offerings.

For the reasons set forth above, the Board did not err in complying with "legion" precedent by disregarding the specific circumstances of investment in Stone Lion Capital's current high-dollar hedge fund or Lion Capital's private equity fund, as distinguished from the broader descriptions of services identified in the Application and LION CAPITAL Registrations at issue in this case.

> b.    Even Taking Into Account The Sophistication and Diligence of Investors In The Parties' Current Funds, Confusion Is Likely

Even if the Court were to look beyond the care exercised by ordinary investors as Stone Lion Capital urges (disregarding well-settled law in the process) and consider conditions specific to the parties' current high-dollar investment funds, actionable confusion nevertheless is likely. Although Lion Capital has acknowledged that it is unlikely that an investor could complete the entire due

diligence process for one of the parties' present investment funds and maintain a misunderstanding throughout that process as to the identity of the company with which he or she is conducting business, actionable confusion is not limited to point-of-sale (or in this case point-of-investment) confusion, and the Board did not err in finding likelihood of confusion despite the lack of this one specific form of confusion.  *See* 4 *McCarthy* § 23:5 at 23-42 - 23-50 (discussing various forms of actionable confusion, including confusion as to affiliation or connection, initial interest confusion, post-sale confusion, reverse confusion, confusion of non-purchasers causing damage to reputation, etc.)

Several cases have dealt with the precise issue of confusion in the highly sophisticated world of investment services, and recognize that investor sophistication is largely irrelevant and that damaging confusion is likely in contexts other than at the point of investment.  In *Morningside Group Ltd. v. Morningside Capital Group L.L.C.*, 182 F.3d 133 (2d Cir. 1999), the Second Circuit acknowledged the high level of sophistication of relevant consumers, but criticized the District Court's "wooden" application of the general rule that consumer sophistication lessens the likelihood of confusion.  *Id*. at 143 (reversing lower court's denial of plaintiff's trademark infringement claim).  In explaining how damaging confusion can occur in the event of two investment services companies with confusingly similar service marks, the Court noted:

> [T]he nature of the financial investment market renders the proximity of the two company's services particularly troubling in likelihood-of-confusion terms.  High-level investment business is commonly conducted based on trust and personal relationships among individuals.  If any investor reads about a Morningside Capital investment… and mistakes that transaction for a Morningside Group investment of which it was not aware, it may well feel 'cut out' of a potentially lucrative deal.  Unless it communicates with someone at Morningside Group to express its displeasure and thus discovers its mistake, its business relations with Morningside Group could be soured.  In that market, then, even positive publicity for Morningside Capital could cause business problems and lost opportunities for Morningside Group.  And it is of course obvious that adverse consequences for Morningside Group could also flow from a converse scenario – unfavorable publicity attendant on a Morningside Capital transaction.

*Id.* at 140 (footnote omitted).

In a case brought by K2 Advisors against K2 Volatility Fund and K2 Capital Management, the District Court for the Southern District of New York explained:

> The Court also notes that the injury that plaintiff will suffer from defendants' operation under the name 'K2' arises not from mistaken investment, but from potential investors eschewing opportunities to meet with plaintiff and to learn about its products because of the word-of-mouth association between defendants' fund and K2 Advisors' family of funds… Alternatively, K2 Advisors will lose control of its reputation by virtue of being associated with defendants.

*K2 Advisors*, *L.L.C. v. K2 Volatility Fund*, *LP*, 01-CV-3984 (AGS), 2002 WL 31235701, at *14 (S.D.N.Y. Oct. 4, 2002).

The foregoing cases aptly describe the confusion that is likely to occur (irrespective of sophistication and diligence associated with actual investment) and that is of paramount concern and risk to Lion Capital if Stone Lion Capital obtains

a registration for the STONE LION CAPITAL mark, which incorporates the LION

CAPITAL Marks in their entireties.  As Lion Capital's head of investor relations

Kelly Mayer testified concerning the process of raising capital for Lion Capital:

> [The process] begins with an initial contact… [which is] a critical part
> of developing that ongoing relationship with the individual or the
> institution, and to the degree that that individual or institution has
> misinformation, erroneous information, a misperception of Lion
> Capital by virtue of mistakenly attributing activities or strategy or
> performance… that perhaps are actually pursued by Stone Lion
> Capital and thereby ultimately causes us to not have as successful an
> outcome to that initial contact, therein confusion can develop and that
> can harm our business.

(A4087-88.)  Mr. Mayer noted that this misperception may develop before Lion

Capital can even make its own connection with the investor, by misinterpretation

of press publicity or otherwise.  (A4088-89.)

Yet another way Lion Capital would be harmed by confusion between the

parties' marks is on the investment side of its business.  To open discussions with

any company that Lion Capital has assessed may be a prudent investment, Lion

Capital must initiate contact with that company, frequently by phone calls and/or e-

mails from Lion Capital's investment team to the target company.  (A4184-85;

A4187-89.)  Indeed, Lion Capital casts a "wide net in order to find those few that

either come up for sale or where we can find a way to eventually acquire or invest

in the business."  (A4185.)  If a company has a misperception about the nature of

Lion Capital's business as a result of confusion, it may not respond to a

solicitation.  (A4187.)  Again, investor sophistication and diligence never come into play in this scenario.

Stone Lion Capital attempts to pigeonhole the confusion apt to occur between the LION CAPITAL Marks and STONE LION CAPITAL as initial interest confusion, and then claims that this Court has "refused to embrace" initial interest confusion, citing to *Weiss Associates Inc. v. HRL Associates*, *Inc.*, 902 F.2d 1546, 1549 (Fed. Cir. 1990).  (App. Br. at 28)  *First*, this Court has not rejected the initial interest confusion doctrine as Stone Lion Capital suggests.  In fact, the Board in *Weiss Associates* recognized initial interest confusion as the basis for sustaining the opposition.  *See Hrl Assocs. Inc. v. Weiss Assocs. Inc.*, 12 U.S.P.Q.2d 1819, 1823 (T.T.A.B. 1989).  This Court then affirmed that confusion was likely based on an ordinary analysis of the *DuPont* factors (without elaborating how or where that confusion might occur), and held that it therefore did not need to reach the issue of initial interest confusion, expressly reserving consideration of that doctrine "for another time."  *Weiss Assocs.*, 902 F.2d at 1549.

*Second*, it is misleading to simply label all confusion short of point-of-investment confusion as "initial interest confusion," as Stone Lion Capital has done, as the doctrine is typically understood to refer to short-lived confusion that is

dispelled before the point of purchase.[12]  *See e.g.*, *Promatek Indus.*, *Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002) (actionable initial interest confusion is confusion that lures a consumer to a product but that is dispelled before sale is consummated); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987) (initial interest confusion actionable because oil trader might listen to a cold call from defendant under the impression that he is speaking with plaintiff); *see also Secura Comm Consulting*, *Inc. v. Securacom Inc.*, 984 F. Supp. 286, 299 (D.N.J. 1997); *rev'd on other grounds*, 166 F.3d 182 (3d Cir. 1999) (finding initial interest confusion of consumers of large scale security systems defeats sophisticated consumer argument).

While such confusion is a legitimate and serious concern here given the similarity of the parties' marks and identity of the services in issue (i.e., confusion that enables Stone Lion Capital to secure an audience with a potential investor that is actually seeking to meet with Lion Capital) (A4087-88), as in all Section 2(d) cases, the question is whether an appreciable number of consumers are likely to be

---

[12] In its footnote 4, Stone Lion Capital notes that some courts have rejected the initial interest confusion doctrine.  (App. Br. at 28 n.4.)  However, "most courts now recognize the initial interest confusion theory" as a form of confusion that triggers a finding of infringement.  4 *McCarthy* § 23:6 at 23-50 – 23-51 (collecting cases from the Second, Third, Fifth, Sixth, Seventh, Ninth and Tenth Circuits recognizing initial interest confusion).

confused, without limitation in terms of the context of that confusion.[13]  Confusion

might cause an investor altogether to eschew an opportunity to meet with Lion

Capital to learn about its investment offerings.  *See K2 Advisors*, 2002 WL

31235701, at *14 (posing such a scenario as a likely form of confusion); (A4087-

88.)  Misperception may develop before Lion Capital can even make its own

connection with a potential investor, by misinterpretation of press coverage or

otherwise.  *See Morningside Grp.*, 182 F.3d at 140 (noting the concern of investor

misperception of press coverage); (A4088-89.)  An investor might decline to make

its own contact with Lion Capital under the misimpression that it is associated with

Stone Lion Capital.  Also, a company in which Lion Capital has an interest in

acquiring could become confused about the nature of Lion Capital's business.

Although Lion Capital need not account the many ways in which confusion

could and likely will occur, the above cases and witness testimony are illustrative

of how confusion is likely to occur and why investor sophistication and diligence

do not lessen the likelihood of confusion.  "[T]here may be no effective way to

measure the losses of sales or potential growth – to ascertain the people who don't

knock on the door or to identify the specific persons who do not [return] because of

the existence of an infringer."  *Morningside Grp.*, 182 F.3d at 140 (citation

---

[13] Notably, in both *Morningside* and *K2*, the courts found a likelihood of pre-investment confusion and acknowledged that confusion at the point of investment is unlikely, yet neither case characterized the likely confusion as initial interest confusion.

**CONFIDENTIAL MATERIAL OMITTED**

[██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████]

offerings.  But more importantly for purposes of this appeal, the *likelihood* that

such confusion and resulting losses have occurred and/or will occur is extremely

high as evidenced by the relevant likelihood of confusion factors, all of which

favor Lion Capital (or are neutral) as the Board concluded and as set forth above.

**4.     The Board's Assessment of the Relevant Purchasers and Trade
        Channels Was Proper**

The Board's analysis of these factors was simple, as it must be.  Because

Stone Lion Capital's Application contains no limitation on trade channels or

targeted customers, the Board was required to presume as a matter of law that the

services identified in the Application will be offered in all channels of trade and to

all customers for such services.  And because the parties' services in the

Application and LION CAPITAL Registrations are legally identical ((A9-10); *see

supra* p. 15 at n. 5), the channels of trade for and customers of the parties' services

must overlap. *In re Elbaum*, 211 U.S.P.Q. 639, 640 (T.T.A.B. 1981); *Packard

Press*, *Inc. v. Hewlett-Packard Co.*, 227 F.3d 1352, 1359 (Fed. Cir. 2000);

*Octocom Sys.*, 918 F.2d at 942.

Stone Lion Capital does not dispute that both parties target the same fund of

funds, pensions, institutional investors, businesses, companies and high-net-worth

individuals.  Rather, relying once again on a description of services not contained in the Applications, it argues that the alleged differences between the parties' actual investment offerings may result in different individuals at these institutions being responsible for considering and evaluating each party's offering.  (App. Br. 42-43.)  This argument requires the Court to look beyond the filings in issue, ignore the legal presumption described above and consider actualities pertaining to the parties' current advisory services.  Thus, it is legally impermissible. *See Packard Press*, 277 F.3d at 1359; *Octocom Sys.*, 918 F.2d at 942.  Stone Lion Capital is correct that the Board was required to consider the actual persons (and not just the institutions) that make the investment decisions.  (*Id.*)  However, there is no basis to conclude that the above-described presumption ends at the institutional level.  Logically, because the investment advisory services in issue are identical, the presumption is that the relevant consumer, in this case the individual responsible for making investment decisions, also is the same.

The flaw in Stone Lion Capital's reasoning is only illuminated by the *Electronic Designs* case, which Stone Lion Capital again cites here.  In *Electronic Designs*, this Court held that although the same institutions may purchase power supplies and battery chargers (the goods in the application in issue) and computer programming services (the services in the registration in issue), the actual individuals that typically purchase those goods and services at any one institution

**CONFIDENTIAL MATERIAL OMITTED**

are different.  Here, unlike in *Electric Designs*, the services in the Application and

LION CAPITAL Registrations are legally identical, so there is simply no cause or

basis to assume that the individuals that would receive such services would differ.

Even if the Court were to consider the parties' current, specific investment

services as distinguished from the services identified in the Application and LION

CAPITAL Registrations, there still is direct overlap in actual investors.  By Stone

[█████████████████████████████████████████████████████████]

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.[14]

---

[14] Stone Lion Capital disingenuously states that Lion Capital's witness Kelly Mayer
testified that he was not aware of any overlap of the parties' investors (i.e., any
institutions or individuals that hold positions in both parties' funds).  (App. Br. at 45;
A4901.)  But Mr. Mayer could not possibly know of any overlap as he does not
know the identity of any of Stone Lion Capital's investors.  In fact, Stone Lion
Capital's counsel objected to questioning about the identity of her client's actual
investors.  (A4478-81.)  And by the same token, Stone Lion Capital testified that it
*did not and could not know* whether there is any actual overlap in the parties'
investors.  (A4481.)

██████████████████████████████████

██████████████████████████████████

█████████████████████████████████ ]

A3511.); *see Ritz Hotel, Ltd. v. Ritz Closet Seat Corp.*, 17 U.S.P.Q.2d 1466, 1470

(T.T.A.B. 1990) (a trademark owner can preclude similar marks not only in

connection with related services, but also for services that might reasonably be

expected to emanate from the owner's business); *see also K2 Advisors*, 2002 WL

31235701, at *13 (determining that while parties offer different investment services,

they offer the same "genre of products," namely "alternative investment products"

and so Plaintiff can be expected to "bridge the gap" and offer the investment

defendant was offering).  If either party were to expand its investment offerings to

include the investment of the other (which would not render the advisory services

associated with that investment to be outside the scope of its USPTO filing(s)), the

parties' consumers of that investment would overlap in all accounts.

Moreover, the parties' investments are not as different as Stone Lion Capital

makes them out to be, and there is no question that they are competing for the same

investment dollars.  Both parties offer alternative investments with a focus on

distressed debt to the same pool of wealthy investors.  (A4794-95; A4484-85;

A4069-72; A3508-10.)  The Second Circuit and the District Court for the Southern

**CONFIDENTIAL MATERIAL OMITTED**

District of New York (the forums where one would expect to find trademark litigation in the field of investment services) have concurred that regardless of any differences between the investment offerings of two investment services companies, they are still competing in the same market:

> In particular, both companies seek individuals with disposable income who desire investment opportunities.  Presumably, individuals likely to invest in individual stocks would also be likely to invest in mutual funds… While the companies here perform different specific services, they each compete for the same investor dollars and hence deal in the same markets.

*Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 285 (S.D.N.Y. 1998); *see also Morningside Grp.*, 182 F.3d at 140 (Second Circuit finds that "[a]lthough the two entities had focused their investment efforts on somewhat different industries "they both seek out direct investment opportunities for themselves and others… [and thus] their services are related and proximate") (citation omitted); *Lane Capital Mgmt. Inc. v. Lane Capital Mgmt.*, *Inc.*, 15 F. Supp. 2d 389, 398-99 (S.D.N.Y. 1998) (although parties focus on different submarkets within the investment services industry, both seek wealthy individuals and institutions desiring investment opportunities, and both deal with many of the same financial institutions).

Echoing the economic rationale set forth in the foregoing cases, after noting

[██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████]

testified, "Investors of those types particularly today tend to have a limited amount of capital that they can deploy across whatever number of strategies they have decided to pursue and so in that sense investment houses are in competition for that limited capital with each of the investors which we are targeting."  (A4086.) Accordingly, any distinctions between the nature of the parties' respective investments, while irrelevant under the applicable law cited above, in any event do not discount the direct competition between the parties for investment capital.

For all of the foregoing reasons, the overlap of channels of trade and overlap of relevant consumers factors both heavily favor Lion Capital.

## C.    STONE LION CAPITAL MISREPRESENTS THE RECORD WITH RESPECT TO USE OF LION-VARIANT MARKS BY THIRD PARTIES

After extensive discovery and motion practice on the issue of third party use of LION-formative marks in connection with financial services,[15] the Board held that (i) "the number of LION-formative marks with evidence relating to their actual use in association with similar services is small," (ii) it "cannot conclude that the record contains sufficient probative evidence of third-party use to establish a

---

[15] Lion Capital filed a motion to strike the vast majority of Stone Lion Capital's purported evidence of third party use consisting of Internet printouts, mostly directory listings.  (A306-16.)  The Board concluded that Stone Lion Capital's Internet printouts did not establish the length or extent of use of any of the names identified therein, acknowledged Lion Capital's countervailing evidence calling into question the status of many of those names, including whether they were even in use, and determined that Stone Lion Capital's alleged third party use evidence with respect to these names had "minimal probative value."  (A16.)

crowded field of LION-formative marks for similar investment services" and (iii)

"Applicant has not established that the investment services field is crowded with

LION-formative marks, such that consumers for legally identical services are

accustomed to distinguishing among them based on relatively small differences in

the marks." (A18-19.).

Although Stone Lion Capital does not challenge these findings, Lion Capital

is compelled to respond to Stone Lion Capital's tangential, false claim in its

recitation of the facts that "[t]here is extensive evidence of third party use of similar

marks in the financial industry," referencing the marks BLUE LION CAPITAL,

LION CHEMICAL CAPITAL, LIONESS CAPITAL PARTNERS & DESIGN and

LION HOUND. (App. Br. at 12.) Stone Lion Capital submitted *no* evidence

whatsoever that the marks LIONESS CAPITAL PARTNERS & DESIGN and LION

HOUND are in use. Thus, there is no basis for a conclusion that they impact

consumer perception of the strength of the LION CAPITAL Marks.[16] And while

---

[16] It is anticipated that Stone Lion Capital will point out that Lion Capital entered
settlement agreements with these entities some time ago. *First*, that does not change
the fact that the record is devoid of evidence that they are in actual use such that they
could be relevant. *Second*, it is well-established that file-wrapper estoppel does not
apply in trademark cases, and what a party believed concerning the likelihood of
confusion with another mark at another time is not relevant to the likelihood of
confusion analysis in this case. *Anthony's Pizza*, 95 U.S.P.Q.2d at 1281-82 (in
Board proceeding brought by ANTHONY'S PIZZA & PASTA against owner of
ANTHONY'S COAL-FIRED PIZZA, prior co-existence agreement with registrant
of ANTHONY'S PIZZA THE WORLD'S GREATEST does not materially affect
likelihood of confusion analysis).

there is some evidence in the record that LION CHEMICAL CAPITAL and BLUE LION CAPITAL are in use, there is no evidence of the volume of business conducted by Lion Chemical Capital (A4837-39) and Blue Lion Capital's business volume is relatively small and geographically limited.  (A4251; A4265; A4286-88.)  Moreover, both companies are relatively unknown in the investment services industry as evidenced by the testimony of Stone Lion Capital's own COO and CFO, who was completely unaware of either company (or for that matter, any company with a LION-formative name other than the parties to this case) despite more than 20 years working at some of the most prominent investment services firms in the industry.  (A4804-12; A4495-96.)  Consistent with the Board's above-referenced findings, two remote uses of marks that include the term LION (as well as other terms) do not have a legally significant impact on consumer perception of the LION CAPITAL Marks or the likelihood of confusion between the LION CAPITAL Marks and STONE LION CAPITAL.  *See Palm Bay Imps.*, 396 F.3d at 1373 (relevant third party use inquiry is whether the relevant consumers are aware of the identified third party use).

Stone Lion Capital also points to a series of LION-variant names that one can find (mostly in directory listings) when one conducts an Internet search.  (App. Br. at 12-13.)  But it does not even try to explain how the mere appearance of a LION-variant name online is probative in this case.  Indeed, it is not.  *Palm Bay*

*Imps.*, 396 F.3d at 1373 ("The probative value of third-party trademarks depends entirely upon their usage"); *Penguin Books Ltd. v. Eberhard*, 48 U.S.P.Q.2d 1280, 1284 n.5 (T.T.A.B. 1998) (business listings are of limited probative value because they do not show that the businesses actually exist or that the public is aware of them).  Moreover, Lion Capital submitted abundant *affirmative* evidence to the Board that in fact, most of the referenced names are not in use at all (which is telling considering the difficulty of proving a negative), some as a result of Lion Capital's own enforcement efforts. (A4744-55; A5476-77at ¶¶ 5, 8; A5481-517; A5534-45; A5597-604; A5609-19; 5624-29; A5669-70; A5673-75; A5700-07.) Based on this evidence, the Board concluded that "the number of LION-formative marks with evidence relating to their actual use in association with similar services is small" (A18-19), not "extensive" as Stone Lion Capital disingenuously states. (App. Br. at 11.)

## CONCLUSION

For the foregoing reasons, Lion Capital respectfully requests that this Court affirm the Board's decision, and the STONE LION CAPITAL Application be abandoned with prejudice.

Dated:  November 1, 2013

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By: /s/ Michael Chiappetta
Michael Chiappetta
866 United Nations Plaza
New York, New York  10017
Phone:  (212) 813-5900
Facsimile:  (212) 813-5901
Email:  mc@fzlz.com

*Attorneys for Opposer*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 1st day of November, 2013, I caused this

Corrected Non-Confidential Brief of Appellee to be filed electronically with the

Clerk of the Court using the CM/ECF System, which will send notice of such filing

to the following registered CM/ECF users:

> Karol A. Kepchar
> Ruthanne M. Deutsch
> Emily C. Johnson
> Patricia A. Millett
> AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
> 1333 New Hampshire Avenue, NW
> Washington, DC  20036
> (202) 887-4104
>
> *Attorney for Appellant*

/s/ Michael Chiappetta
*Counsel for Appellee*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      28.1(e)(2) or 32(a)(7)(B) because:

      [ X ] this brief contains [*13,265*] words, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

      [    ] this brief uses a monospaced typeface and contains [*state the number
      of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
      32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      [ X ] this brief has been prepared in a proportionally spaced typeface using
      [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

      [    ] this brief has been prepared in a monospaced typeface using [*state
      name and version of word processing program*] with [*state number of
      characters per inch and name of type style*].


Dated: November 1, 2013              /s/ Michael Chiappetta
                                     *Counsel for Appellee*